UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

RODERICK WRIGHT,

Plaintiff,

v.

AMERICAN SPEECH-LANGUAGE-HEARING ASSOCIATION,

Defendant.

Case No. 1:25-cv-01367-PLM-MV

Hon. Paul L. Maloney

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR AN ORDER UNDER FED. R. CIV. P. 56(g) STATING THAT A MATERIAL FACT IS NOT GENUINELY IN DISPUTE AND TREATING IT AS ESTABLISHED, OR IN THE ALTERNATIVE FOR DECLARATORY JUDGMENT**

## I. Introduction

This case is about Defendant's retroactive reclassification of a Clinical Fellowship that began in 2022 into a "2023 start," and the credentialing action built on that revision. The organizing fact of the record is simple: every initiation document — the employment agreement, the signed Clinical Fellowship Year Plan, two New Mexico licenses, and the supervisor of record's written confirmation — was issued in 2022, and Defendant's own Clinical Fellowship Portal records the same 2022 start date. Defendant has identified no initiation document dated 2023 from any state agency, employer, mentor, or system.

The documentary record entitles Plaintiff to the requested determination. Defendant's own certification standards draw a single line at December 31, 2022: for CF experiences "beginning

on or before December 31, 2022," up to 100% of direct client contact hours may be earned through telepractice, and for those "beginning on or after January 1, 2023," only "up to 25%" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2409; accord ECF No. 61-2, PageID.661; ECF No. 61-5, PageID.670). The initiation date therefore decides which rule governs. The evidence on that date is documentary, contemporaneous, and comes largely from Defendant's own files and from third parties no applicant controls. Defendant's contrary position rests on a characterization first advanced in September 2023. Defendant has admitted in discovery that its standards do not condition a start date on prior direct client services (ECF No. 77, PageID.865), and its own Guide forecloses that characterization at its root: a fellow who received less than the required supervision has still, in Defendant's own words, "complete[d] a partial segment" — part of a Clinical Fellowship already underway. There is no segment of a fellowship that has not begun. At minimum, even if the Guide is read as governing credit rather than initiation, it makes the 2022 period objectively reasonable to describe as part of the Clinical Fellowship and defeats any claim that Plaintiff knowingly reported a false start date. The only consequence Defendant's Guide attaches to the missing supervision is that the deficient hours are not counted; nothing in Defendant's published text restarts the fellowship or moves its start date (Ex. 4, at 6).

**II. Statement of Undisputed Material Facts**

Plaintiff contracted with The Stepping Stones Group effective October 17, 2022. The offer letter he executed on October 5, 2022 states the assignment on its face: "Discipline: 32 Clinical Fellow," "Assignment location: Albuquerque Public Schools," and an "Assignment schedule" of "6.5 hours per day, 5 days per week, with an expected total of 916.5 hours" at $37.00 per hour (ECF No. 1-2, PageID.11-16). Defendant did not author that document, dated nearly three months before the December 31, 2022 line its own guidance draws. Three weeks after Plaintiff

was hired the employer described the assignment the same way in its own internal correspondence. On October 28, 2022, a Stepping Stones staffing coordinator wrote to Victoria Hanawalt under the subject line "Roderick (Rodney) Wright- APS CF": "Rodney was hired 10/5 for Albuquerque NM teletherapy. Can we please follow up regarding his district background check?" (ECF No. 29-3, PageID.313.) The employer and Plaintiff's supervisor of record were treating the placement as a Clinical Fellowship delivered by teletherapy in October 2022 — precisely the arrangement Defendant's 2022 guidance permits. Victoria Hanawalt, CCC-SLP — New Mexico license SLP5863, and Plaintiff's supervisor of record — signed his New Mexico Clinical Fellowship Year Plan on October 14, 2022, naming an October 17, 2022 beginning date (ECF No. 1-3, PageID.17-18). New Mexico issued Clinical Fellow license No. SLPCF22006 on November 23, 2022 (ECF No. 61-4, PageID.668), and its Public Education Department issued a "PRE K-12 SPEECH LANGUAGE PATHOLOGIST FELLOW" license on December 28, 2022 (Pl.'s Opp'n Ex. M, ECF No. 86-14, PageID.2462). The Albuquerque placement did not survive the winter break: the assignment was cancelled before client sessions began, Stepping Stones moved Plaintiff to "displaced" status — its handbook's category for an employee "without an active assignment," used "to redirect the employee to another assignment" — and his employment ran through January 31, 2023 (ECF No. 61-7, PageID.684-685; ECF No. 84-2, PageID.954). From February 2023 Plaintiff continued the fellowship at a new placement, with Rachel Johannes as his mentor — in her words, "I started as his mentor in early February 2023" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2396). The cancellation ended a placement, not the fellowship. Three mentors appear in this record on paper — Laura Syme, introduced by the employer on October 13, 2022, while her New Mexico license was pending; Marlaina Stevenson, introduced on November 8, 2022; and Rachel Johannes, from February 2023 — but no document

in this record shows that either transfer of supervision was ever completed, and Victoria Hanawalt, the designated lead on the placement, remained the supervisor of record on his state license throughout the Stepping Stones placement (ECF No. 85-10, PageID.1188; ECF No. 85-16, PageID.1279-1286). On October 24, 2023 — eleven months before the ethics complaint and in a filing made to a state regulator rather than to Defendant — Rachel Johannes signed a second New Mexico Clinical Fellowship Year Plan for Plaintiff's Carlsbad, New Mexico placement, entering in the form's "CFY SITE" field: "Hillcrest Elementary School-Carlsbad New Mexico via Teletherapy with Unlimited Teletherapy LLC." On that form — whose fields read "SUPERVISOR'S NAME" and "SIGNATURE OF SUPERVISOR" — she entered "12127385" — her ASHA certification number — in the form's "LICENSE NUMBER" field and stated the "ESTIMATED BEGINNING DATE OF CFY" as "10/17/2022." (ECF No. 29-19, PageID.354.) Defendant later censured Johannes for "[a]ffirm[ing] on a Clinical Fellow's mentor verification form that a Clinical Fellow began their Clinical Fellowship (CF) approximately four (4) months before the Respondent started supervising the individual. Failed to comply with ASHA's certification standards and guidelines for clinical supervision of a Clinical Fellow." (ECF No. 45-2, PageID.509.) The first of those two sentences states no violation under Defendant's own standards, which contemplate a fellowship completed across multiple experiences and mentors and key the deadline to "the date on which the first CF was initiated" (ECF No. 61-3, PageID.666). Stepping Stones' human-resources verification states that Plaintiff "was employed as a full-time Clinical Fellow with New Mexico/Albuquerque Public Schools from 12/08/2022 until 01/31/2023," and that his "employment contract with The Stepping Stones Group remained active beginning on 12/08/2022 and was not canceled or terminated prior to the end of his displaced status on January 31, 2023." (ECF No. 84-2, PageID.954.)

The mentor-verification record for Rachel Johannes reports the dates of the Clinical Fellowship itself, not the period she personally supervised — Defendant went outside its own verification form to ask her whether "she had begun mentoring the Respondent on October 17, 2022" (ECF No. 38-1, PageID.417) — and it shows a fellowship "Start Date: 10/17/2022," "End Date: 02/29/2024," "Weeks Reported: 58.00," and "Hours Reported: 1450.00." (ECF No. 29-16, PageID.351; ECF No. 29-17, PageID.352.)

Defendant's 2020 certification standards and its COVID-19 telepractice transition guidance key the applicable rule set to when a fellowship is "initiated," and require that "[a]t least 80% of the Clinical Fellow's major responsibilities during the CF experience" be in direct client contact (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2409; ECF No. 61-2, PageID.661). In discovery, Defendant admitted — subject only to the caveat that the fellowship's components be "verified by the proper CF mentor using the CF Mentor Verification Form" — that its written standards in effect during 2022–2023 do not state that a "start date" requires that the fellow has already provided direct client services (ECF No. 77, PageID.865), and that it has no documentation from Albuquerque Public Schools or The Stepping Stones Group stating that Plaintiff's 2022 orientation and professional training did not occur (ECF No. 77, PageID.869). Asked whether it had ever recognized initiation based on professional activities — the interrogatory's examples were "orientation, training, or file review" — preceding first direct client contact, Defendant answered "Yes," qualified only by a requirement that the first segment's requirements be met (ECF No. 84-1, PageID.950-951). The qualification concedes the sequence: whether a segment's requirements were met can be known only after the segment has run, so it cannot be a precondition of the initiation that starts it — recognition on that basis is necessarily recognition that the fellowship began first.

Plaintiff asked Defendant to define its own term, and Defendant could not. On September 12, 2023 at 1:31 p.m. he wrote to Defendant's certification department: "Hello could you explain to me what is the 'initiation of the CF experience' please?" He then listed every candidate event in his own words: "For my CF, I had to: have my school designee sign off that I had completed my studies, submit an aplication [sic] to ASHA, get my CF licensure and Teacher's certificate, interview and get selected to start my position as a CF, recieve [sic] my caseload, schedule my clients, and get my administrative hours and direct clinical hours." He asked whether "initiation" meant "the date that the designee signed off my hours or something further along the line above." (ECF No. 1-6, PageID.28-29.) At 2:10 p.m. Defendant answered with the term itself: "That would be the actual start date of your CF experience that we're looking for. The clinical fellowship needs to be started/initiated no more than 24 months after the application for certification is submitted with payment." (Id., PageID.27.) Plaintiff pressed at 2:34 p.m.: "Yes, that is what I am trying to find out. What does the start date entail? The date my program director signed off? Or the Date I got my CF license? Or the date I was hired to do my CF?" (Id.) At 4:08 p.m., Defendant's certification staff member Lilly Schwartz told Plaintiff that "[u]sually it would be the first day of actual work" — "[s]o if you were hired to start on a day but then that was pushed back, it would be whatever day you actually began working at your placement. That could include training/orientation on your frist [sic] day/week . . . ." (ECF No. 1-6, PageID.26.) At 4:15 p.m., Plaintiff disclosed that he "was hired to start after the winter semester in January" — a reference to client sessions beginning at his existing placement when schools resumed after winter break (ECF No. 38-1, PageID.415-416). At 4:20 p.m. — with that disclosure in hand — Schwartz repeated the same rule: "Yes, and what was the first day that you actually went in to work for the agency you were hired for? That would be your start date." (ECF No. 1-6,

PageID.25; Defendant's own hearing record alters both sentences, rendering the 4:08 p.m. answer as "the day of actual work" and this one as "the first date you actually went to work," ECF No. 38-1, PageID.415.) Schwartz sent Plaintiff nothing further on the question, and never told him that anyone else would take it up (ECF No. 38-1, PageID.416). Director of Clinical Certification Amanda Gallagher, who had said nothing during that exchange, entered the thread eighteen hours later and asserted the contrary position — that the Stepping Stones period would not count and the fellowship would be treated as beginning in 2023. (Id.) Plaintiff had asked Gallagher twice to stop before he complained about her. The requests had a foundation. The September 12 inquiry was itself diligence — nearly eleven months into the fellowship, and before he filed the operative application, Plaintiff went back to Defendant to confirm the direction he had been given before it began — and Defendant's own staff answered the same way, twice, in writing, that same day. On October 5, 2023 at 6:05 p.m., writing to Defendant's Action Center under the category "unwanted communication," he said so: "I have told her twice so far to not contact me again. . . . I do not need this type of harassment." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2427-2428; accord ECF No. 80-3, PageID.919.) The next day Gallagher forwarded the correspondence to Chief Certification Officer Todd Philbrick, noting that Plaintiff "contacted the action center today (below) as he feels that my emails are harassment," acknowledging that "he requested that I not reach out again because he had enough stress already" and that she nonetheless "responded to his email," and describing the fellowship in her own words: "He started a fully remote CF experience with Stepping Stone Group in December of 2022 . . . ." (Ex. 1, Bates 000416–000417.)

On June 17, 2024, Philbrick asked Plaintiff's mentor Rachel Johannes for the "[d]ate of hire, start date, and end date of the CF experience" and the "[m]ethod of supervision" — questions

that appear nowhere on the mentor verification form (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426). On June 24, 2024, she answered: "Rodney started his CF experience on 10/17/2022 and ended on 2/29/2024." (Id.) At 10:10 the next morning, Philbrick replied to her in a single line: "Thank you for this confirmation." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2394 (Bates 000079).) Defendant certified Plaintiff that same day. Its Director of Clinical Certification put the certification and the referral for an ethics complaint in one message that morning: "Ugh, this is a tough pill to swallow. I agree that at this point we need to grant certification based on the mentor's response, and I think we then should consider bringing the case to the CFCC to see if there is a member who would like to make a formal ethics complaint against Rodney and/or the mentor since (as Lilly mentioned) there is published documentation that disputes the CF start date in the application." (Pl.'s Opp'n Ex. D, ECF No. 86-5, Bates 000424.) No such ASHA publication has ever been identified, and none has ever been produced. What Defendant's staff pointed to was an employer's website showing when Plaintiff's 2023 employment began (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000425–000426). That page says nothing about when his Clinical Fellowship began, and could not: Defendant's own Guide has a section headed "Clinical Fellow Changes Settings/Employers Between Segments," and it treats the fellowship as continuing across the change (Ex. 4, at 6). A later employment start date is not a fellowship start date. The 2023 start date originates in Gallagher's emails, written months after the fact, and every later recitation derives from them. And what Defendant had actually published disputes nothing in the application — it does the opposite: the CFCC's own COVID-19 guidance provides that fellows who "initiated their CF experience on or before December 31, 2022" may engage in telepractice under the 2022 guidelines "for the entirety of their CF experience" — the very category the application claimed (ECF No. 61-2, PageID.661). Gallagher then drafted the

complaint, sent it to CFCC Vice-Chair Laura Verdun asking her to “let me know if you approve,” and submitted it to the Board of Ethics herself, “On behalf of the Council for Clinical Certification (CFCC) . . . .” (ECF No. 71-1, PageID.766-767.) Three weeks earlier, on the companion complaint against Plaintiff’s mentor, she told Verdun to “sign, and return so that I can submit it to the BOE on your behalf,” adding: “Once this has been submitted, I will put together the complaint against Mr. Wright.” (Pl.’s Opp’n Ex. D, ECF No. 86-5, PageID.2436.) The record does not show that the Council itself considered the matter. Defendant’s interrogatory answer states that Committee minutes “were provided with the previous Request for Production” (ECF No. 84-1, PageID.950); no such minutes, and no attendance record or vote showing the Council reviewed Plaintiff’s application or authorized a complaint, appear in the pages produced. Plaintiff told the Board that it had been given less than the whole document. Defendant’s own Review and Motions Form records that Plaintiff “alleged that the Complainants’ supplemental materials only contained a partial version of an email chain between the Respondent and Ms. Hanawalt, which included Ms. Hanawalt’s entire confirmation that the Respondent would ‘be able to complete [his] CFY experience as a TeleSLP since [he] began the CF experience before 12/31/2022.’” (ECF No. 61-6, PageID.681.) The Board never addressed that objection. What the Board was missing was not another message in the chain. It was the operative sentence itself, severed mid-word. Defendant’s supplemental complaint material contains two copies of the same December 8, 2022 email, and each is cut off at the right margin at the same point: the line ends “Yes, you will be able to complete your CFY experienc[e]” and the line beneath it reads only “12/31/2022.” (Pl.’s Opp’n Ex. B, ECF No. 86-3, PageID.2418 (Bates 000103); id., PageID.2426 (Bates 000111).) The two are not impressions of a single bad copy: one is a photograph of a printed page, the other a printout of the mail client bearing its own 9/12/23 print header. Plaintiff

had sent the email twice, and said so in the message that transmits the second copy — "Just in case you did not get the memo. I have included it here." (Id., PageID.2425 (Bates 000110).) Both times the file kept the same severed sentence. The words that carry the meaning — "as a TeleSLP since you began the CF experience before" — appear on neither page, and in the state in which the Board received it the sentence cannot be read at all. The complete message, filed with the Complaint, reads: "Yes, you will be able to complete your CFY experience as a TeleSLP since you began the CF experience before 12/31/2022." (ECF No. 1-5, PageID.22.)

Johannes was not Plaintiff's first mentor. Defendant's own Guide provides that a Clinical Fellow "may have more than one CF mentor" (Ex. 4, at 6), so on Defendant's own rules a fellowship with more than one mentor begins before a later mentor's supervision does.

**III. Standard of Review**

Summary judgment is appropriate where the record shows no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute is "genuine" only if a reasonable factfinder could return a verdict for the nonmoving party on that issue, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If complete summary judgment cannot be granted, Rule 56(g) authorizes the order sought here, quoted in Section A below. Fed. R. Civ. P. 56(f), (g).

**IV. Argument**

This brief addresses the single predicate fact — when Plaintiff's Clinical Fellowship initiated — and asks the Court to establish under Rule 56(g) that it initiated no later than December 31, 2022, the date Defendant's own published guidance makes controlling. That is the whole of the finding

required; the evidence supports October 17, 2022, but no precise date need be fixed. Nothing turns on which 2022 date the Court might select: every path lands before December 31, 2022, and that is the only line Defendant's own guidance makes material.

**A. The Court should establish under Rule 56(g) that Plaintiff's Clinical Fellowship initiated no later than December 31, 2022.**

The relief requested is available on any of three independent footings, and Plaintiff asks for it in the alternative. First, Rule 56(a) expressly authorizes a motion directed at less than a whole claim: a party may move for summary judgment, "identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). Second, Rule 56(g) supplies the mechanism for the disposition Plaintiff seeks: where the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). The rule's predicate is present here: Defendant's own Motion for Summary Judgment is pending (ECF No. 80, PageID.878), and the rule is not confined to the movant's own motion. To whatever extent the Court declines to grant Defendant all its motion requests, that predicate is met, and the initiation date is material to the claims and defenses the motion puts at issue. Plaintiff himself requests only the determination of one dated fact and does not ask the Court to enter judgment on any claim in this motion — the disposition Rule 56(g) describes. Third, if the Court concludes that Rule 56(g) operates only as an adjunct to a ruling on a claim, the same determination is available as a declaratory judgment under 28 U.S.C. § 2201 — the declaration already pleaded at First Amended Complaint ¶ 46(a), that Plaintiff's "Clinical Fellowship initiated in 2022 and is governed by the CFCC's 2022 telepractice guidelines for the entirety of his CF" (ECF No. 58,

PageID.604) — because the parties dispute the legal consequence of the initiation date under Defendant's published guidance, and that dispute is definite, concrete, and ripe. Nothing turns on which route the Court takes. The fact is either genuinely disputed on this record or it is not.

Every finding the Board of Ethics made against Plaintiff — the alleged violation of the 25% telepractice limit and the alleged "false data" — depends on a single premise: that the fellowship did not begin until 2023. On the first finding that dependence is express. The operative rationale for the Principle II, Rule B violation, as recorded in Defendant's own adjudication minutes for both the June 14, 2025 vote and the October 25, 2025 affirmance, is "the Respondent exceeding the 25% telepractice limit of direct client contact hours during the application process." (ECF No. 61-6, PageID.676, 672.) Defendant's own certification standards draw the line at one date: December 31, 2022 (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2409; ECF No. 61-2, PageID.661; ECF No. 61-5, PageID.670). A finding whose stated basis is a rule that does not apply to Plaintiff is not weakened by the initiation date; it is eliminated by it. Any initiation date on or before December 31, 2022 applies the 2022 guidance, permits the 100% telepractice delivery, and makes the application Plaintiff filed accurate. The evidence points to October 17, 2022, but the Court need find only that the fellowship began at some point before December 31, 2022 — and on this record that narrower proposition is not genuinely disputable.

1. Every definition Defendant's own staff supplied puts initiation in 2022. Plaintiff does not ask the Court to displace Defendant's authority to define when its own program begins; he asks the Court to hold Defendant to the definition its own staff and standards supplied. Certification staff told Plaintiff his start date was "whatever day you actually began working at your placement," including training and orientation (ECF No. 1-6, PageID.26; ECF No. 38-1, PageID.415-417). One month before the cutoff, Defendant's Director of Clinical Certification published the same

rule under her own byline on the National NSSLHA blog: fellows who "begin your CF experience on or after January 1, 2023" "may earn up to 25% of the required 1,260 hours using telepractice," while those who "begin your graduate program or CF experience before December 31, 2022" "may continue following the COVID-19 guidance from the CFCC." (ECF No. 61-5, PageID.670.) Nine months later the same author told Plaintiff that his fellowship had not begun in 2022, and applied to him the rule set her own published guidance reserved for 2023 starts. Defendant's discovery responses confirm the point twice. It admitted that its written standards do not condition a "start date" on prior direct client services (ECF No. 77, PageID.865). And it stated that it "has recognized CF experiences that begin with professional activities if all the necessary requirements of the first segment (or partial segment) are met." (ECF No. 84-1, PageID.950-951.) Defendant cannot rest on that caveat without saying which requirement failed. The segment requirements it has identified as unmet are supervision and the direct-care share — both crediting conditions: the status Defendant's own system records against the first of the three reports its file holds for the October 5 – December 13, 2022 period — "Not enough supervisory activities" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2413) — the reason Gallagher gave Plaintiff in September 2023 (ECF No. 38-1, PageID.416), and the reason Stevenson gave in the letter accompanying her Clinical Fellowship Skills Inventory (CFSI) submission (Pl.'s Opp'n Ex. B, ECF No. 86-3, Bates 000105–000106). Neither is an initiation gate. Defendant's own Guide ties unmet supervision to whether time counts, not to whether the experience began: "6 hours of direct supervision and 6 hours of indirect supervision is required from each mentor during each segment (or part-segment) for the time to count toward your CF," and "[a]ll skills must be rated during each segment (or part-segment) for the segment to count toward your CF." (Ex. 4, at 4.) Defendant's answer to Interrogatory No. 11 names that same 6-and-6 as the "necessary

requirements" its caveat invokes, so the caveat is a counting rule wearing an initiation label. It could not be an initiation gate in any event: whether a segment's requirements are met is knowable only after the segment has run, and a test resolving months later cannot fix the date a fellowship began. And on Defendant's own records — its internal report screen for the 2022 application Plaintiff withdrew — mentor, site, and segment were all validated: "Mentor is Okay," "Site is Okay," "Segment is Okay," effective start 10/5/2022 (Ex. 10, Bates 000604). Its own verb concedes the point in dispute: experiences "begin with professional activities," and the segment's mentorship requirements are satisfied over the segment that follows. Gallagher said the same thing at the time, in the very message that first told Plaintiff his 2022 start did not count. Both reasons she gave were crediting measures: that Plaintiff "didn't receive the necessary direct and indirect mentorship during that time (which would be considered as a partial segment for purposes of your CF report)," and that "the time didn't include at least 80% direct care/care management of clients . . . ." (ECF No. 38-1, PageID.416.) Her own parenthetical places the Stepping Stones period inside Plaintiff's CF report, as a segment of it. Defendant's own description of the 2022 period as a "partial segment" recognizes it as part of a Clinical Fellowship already underway. Nor are the Rule 36 responses merely evidentiary: a matter admitted under Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," Fed. R. Civ. P. 36(b), and Defendant has never so moved. The interrogatory answer stands separately, as Defendant's own sworn statement.

The ethics complaint recites the standards for "CF experiences that begin on or after January 1, 2023" — a 25% telepractice cap, and a requirement that "at least 3 hours of observation occur onsite and in person" — and then states a single reason for placing Plaintiff's fellowship inside that rule set: "The CF report that Mrs. Johannes verified was the only report submitted with Mr.

Wright's application. Therefore, Mr. Wright's fellowship experience did not begin until February of 2023." (ECF No. 80-1, PageID.912.) The premise cannot carry the conclusion. How many mentor reports accompanied an application says nothing about when the experience began; the inference substitutes the date Plaintiff's later mentor began supervising for the date the fellowship began. The complaint draws that very distinction in the preceding paragraph, recording that Johannes "stated that Mr. Wright began his CF experience on 10/17/2022 but she did not begin as his mentor until early February 2023" (id.), and then discards it. Only after moving the start date that way does the complaint reach the charges — "greater than 25% telepractice" and "no onsite, inperson direct supervision per segment" (id.) — and both are, by the complaint's own terms, requirements that apply only to fellowships beginning on or after January 1, 2023. The premise also ignores Defendant's own records. Its system holds three Clinical Fellowship report entries for that same period, each under mentor Stevenson, each reporting a begin date of 10/5/2022, and each crediting 1.00 week and 15.00 hours (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2413). How a report was later dispositioned says nothing about when the experience began; the entries record a 2022 fellowship period in Defendant's own system, three times over. Its own Guide contemplates the multi-report structure it is complaining about: a Clinical Fellow "may have more than one CF mentor," and where there is more than one, "each CF mentor must complete the required supervisory activities for the weeks and hours to be counted toward the completed CF . . . ." (Ex. 4, at 6.) The complaint supplies no fact contradicting the 2022 start: it reasons from the absence of a second report to a February 2023 start, and from that start to the violations. Nor was the Board left to guess at the rule. Defendant's own complaint material includes the 2020 Standards in full, and the operative provision appears there verbatim: "For CF experiences beginning on or after January 1, 2023," up to 25% of direct

client contact hours may be earned through telepractice; “For CF experiences beginning on or before December 31, 2022,” up to 100% may be. The mentorship provision is keyed the same way — “If the Clinical Fellow began their CF experience on or before December 31, 2022,” virtual observation may be used in place of on-site observation (Pl.’s Opp’n Ex. B, ECF No. 86-3, PageID.2409-2410 (Bates 000094–000095)). The trigger Defendant’s own writings state, twice, is beginning — not direct client contact, not completed mentorship, not a credited segment. That document was in the Board’s file, and the Board applied the half of it that does not fit the facts — the half the complaint recited to it. The premise reached the Board through Defendant’s Ethics office, and it entered the Board’s file as a substitution. The BE 25-003 case timeline — whose native metadata identifies Defendant’s Senior Director of Ethics, Katharine Meyer, as its author (Pl.’s Opp’n Ex. J, ECF No. 86-11, PageID.2459) — opens: “August, 2022 Wright applies for ASHA certification. . . . However, his CF start date gets pushed back and then his CF is cancelled at the last minute. During this time, he only receives some non-client training. February 2023 Wright begins a new position with a different employer . . . .” (Pl.’s Opp’n Ex. G, ECF No. 86-8, Bates 000228.) What was cancelled was the placement, not the fellowship — and the same timeline says so several entries later, quoting Plaintiff’s own words: “the assignment was canceled at the last minute so I had to scramble to find another company.” (Id.) The Board was handed a cancelled CF and a 2023 restart in one passage, over Plaintiff’s own contrary account reproduced on the same page. The characterization of the period fares no better. What the record contains for those weeks is training in the district’s own clinical systems — Synergy and MaxCapture — undertaken while Plaintiff set up his clinic with the district’s assistance (Pl.’s Opp’n Ex. K, ECF No. 86-12, PageID.2460; ECF No. 85-20, PageID.1453). Standard VII-A confirms that initiation and crediting run on separate tracks — applicants

completing multiple CF experiences "must complete the CF experiences related to the application within 48 months of the date on which the first CF was initiated." (ECF No. 61-3, PageID.666.)

2. There is no written definition to the contrary — which means there was nothing to "falsify" and no rule to violate. A start date cannot be "false data" unless some fixed, written definition makes it false. Defendant has never produced one. Its standards contain no direct-client-services prerequisite (ECF No. 77, PageID.865); its staff described the start date as the first day of actual work (ECF No. 1-6, PageID.26); its portal accepted and recorded October 17, 2022 (ECF No. 29-16, PageID.351); and its own officials did not settle on one. Gallagher's synopsis says the start date is "the first day 'on the job' (not the date of hire)" and refers to "the experience he initiated in 2022" (ECF No. 71-4, PageID.771). Defendant has never tied that formulation, or any other, to a standard, guidance, or policy it has produced. Nor was the 2022 period empty by Defendant's own accounting: its system credited it at 1.00 week and 15.00 hours (Ex. 10, Bates 000604). Most directly: Plaintiff asked Defendant, in terms, what "initiation of the CF experience" means, and set out the seven candidate events himself (ECF No. 1-6, PageID.28-29). Defendant's answer restated the word: the date sought is "the actual start date of your CF experience." (Id., PageID.27.) When Plaintiff asked again — sign-off, license, or hire? — Defendant supplied the working test its staff actually used: "the first day of actual work." (Id., PageID.26.) Plaintiff does not contend that this exchange fixed a binding definition. He contends the narrower thing it shows: when a member asked Defendant in writing what its own term meant, Defendant restated the term and then supplied a working test drawn from staff practice rather than from any standard. A date cannot be "false data" by reference to a definition that Defendant, asked directly, could state only that way.

Defendant may answer with a sentence from the Sixth Circuit's order denying an injunction pending appeal, which recites that "[n]otwithstanding guidance from ASHA staff, Wright applied for certification using the 2022 start date." (No. 26-1329, Doc. 19-1, at 2 (6th Cir. July 14, 2026).) That sentence is a background recital in an interlocutory order on injunctive relief, not a finding of fact; the panel resolved the motion on the accommodation issue and expressly declined to reach the initiation date. It binds nothing here. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). And it does not survive this record. Plaintiff called Defendant's certification department at least nine times seeking compliance guidance between May and August 2022 — before he was hired on October 5, 2022 and before the fellowship began (Pl.'s Opp'n Ex. A, ECF No. 86-2, PageID.2385-2387). Nearly eleven months into the fellowship, Plaintiff asked Defendant's certification department in writing what its own term meant. Its answer was that his start date "would be whatever day you actually began working at your placement," and "[t]hat could include training/orientation on your frist [sic] day/week." (ECF No. 1-6, PageID.26.) Plaintiff has that day. On December 8, 2022 he attended the district's new-hire training, scheduled 11:30 a.m. to 1:00 p.m. (Ex. 6), and a capture taken during that session at 12:04 p.m. shows the employer's Outlook directory card on his screen identifying him as a "CF Speech Language Pathologist - TELE" (Pl.'s Opp'n Ex. K, ECF No. 86-12, PageID.2460). By the test Defendant's own certification department supplied, that is a start date. Defendant's own staff-prepared Board of Ethics review form quotes that same guidance back to the Board (ECF No. 38-1, PageID.415). Defendant's own analyst confirmed it internally: on October 6, 2023 she wrote that she "did indicate that orientation or onboarding type activities could be considered when thinking about start date," and that this was "before understanding that he had not completed any clinical hours within that position" — after which she "turned it over to Amanda."

(Ex. 1, Bates 000416.) Her account of why she stepped back does not survive the exchange: at 4:15 p.m. Plaintiff told her he "was hired to start after the winter semester in January," and at 4:20 p.m. she answered that his start date was the first day he "actually went in to work" — the same rule she had given at 4:08 p.m., which expressly counted "training/orientation on your frist [sic] day/week." (ECF No. 1-6, PageID.25-26.) Plaintiff applied consistent with the answer Defendant's certification department gave him when he asked what its term meant, not in defiance of it. Gallagher's own synopsis to the Chief Certification Officer that day reported that "Lilly spoke with him via phone and walked him through the reasons that the first experience doesn't count" — a description Schwartz corrected forty-two minutes later: "I only corresponded with him via email." (Ex. 1, Bates 000416–000417.) No document in this record identifies any contrary guidance before Plaintiff began his fellowship; the earliest is Gallagher's September 13, 2023 email, nearly eleven months after. That email also supplies the factual premise on which everything later was built, and supplies it as a question Gallagher answered herself: "If I understand correctly, you did not ultimately work with any clients during your time with the Stepping Stones Group? If that is the case, then the experience cannot count toward your CF . . . ." (ECF No. 38-1, PageID.416.) Plaintiff had not said that. He had written that his start date "kept being pushed back," that he "went through orientation and training in the school system and got [his] caseload two weeks before the students went on break," and that the assignment was cancelled before he could start after the break (id.). Defendant's Director of Clinical Certification supposed the rest, ruled on her own supposition without waiting for an answer, and that supposition passed unexamined into the Review and Motions Form, the complaint, and the Board's findings.

Courts have held exactly this to be arbitrary. In *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791 (1961) — the decision *Dietz v. American Dental Ass'n*, 479 F. Supp. 554 (E.D. Mich. 1979), and *Foundation for Interior Design Education Research v. Savannah College of Art & Design*, 244 F.3d 521 (6th Cir. 2001), both trace this doctrine to — a county medical society excluded a fully licensed physician under a requirement that appeared nowhere in its written by-laws but was applied by its ethics committee in practice. The court held that "the effort of the County Society to apply its unwritten requirement . . . so as to exclude Dr. Falcone from membership, must be viewed as patently arbitrary and unreasonable and beyond the pale of the law." 170 A.2d at 800. A credentialing body that cannot produce the rule it is enforcing is exercising discretion after the fact. The mechanism by which Defendant resolved the conflict in its own records confirms the point: its Senior Director of Ethics told Plaintiff's counsel that "in the Board of Ethics' view, Ms. Gallagher's emails superseded those you received from Ms. Schwartz and any other individuals who are not ASHA employees (including Ms. Hanawalt)." (ECF No. 42-8, PageID.483.) That concedes that contrary written confirmations existed, and that the Board overrode them by ranking one official's assertion above every other source rather than by applying a written standard. The same concession destroys scienter: a Clinical Fellow cannot "know" his start date is false when Defendant's own staff and his supervisor of record told him in writing that it was true.

Defendant's own internal correspondence affirmatively establishes Plaintiff's good faith. On the evening of October 6, 2023 — hours after forwarding Plaintiff's harassment complaint to the Chief Certification Officer — Gallagher wrote privately: "He feels that he initiated the CF in 2022. The CFCC may very well approve it once appealed." (Ex. 2, Bates 000369.) A position Defendant's own Director of Clinical Certification privately assessed as one the CFCC "may

very well approve" cannot be one Plaintiff "knew" to be false. That is Defendant's own characterization, not Plaintiff's: what he reported rested on the calls he made to Defendant's own certification department before the fellowship began, the employment agreement, the signed CFY plans, two New Mexico licenses, and his supervisor of record's written confirmation. An organization that recorded in its own files that Plaintiff believed his fellowship began in 2022, and whose Director of Clinical Certification thought the Council might approve it, was not an organization that believed it was dealing with a lie. After certification, Schwartz confirmed that "[t]he information that the mentor provided is corroborated by what Roderick already put in writing to us previously in terms of having one contract from late 2022 where he did not see any clients that was cancelled and being hired to start a new contract in Feb 2023." (Ex. 7, Bates 000379.) An applicant whose submission Defendant's own analyst calls corroborated is the opposite of one "knowingly provid[ing] false data" (ECF No. 45-2, PageID.508).

Nor does the mentor evidence Defendant invokes say what Defendant claims. Johannes's June 26, 2024 email — the supposed correction — is not a recantation of the 2022 start but a reaffirmation of it: "Rodney started his CFY on 10/17/2022 under a contract for teletherapy with schools. He did training, file reviews, and prep under that contract but the contract was cancelled before he could start seeing students. He then got a new contract and continued his CFY under my supervision." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2394.) Her separate note that she "started as his mentor in early February 2023" answered a different question: Philbrick had asked her, "When did you begin mentoring him?" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2395-2396.) It states the mentorship's start, not the fellowship's. Defendant conflated the two to this Court, representing that "information from his mentor, Rachel Johannes, later clarified that Plaintiff's clinical experience did not actually begin until 2023." (ECF No. 38, PageID.404.) She

clarified no such thing, and the 2023 date has never had a source independent of that substitution. Defendant's own guidance treats a change of mentor the same way: where there are multiple mentors or segments, all must be completed "within 48 months of the date of your first CF experience/segment." (Ex. 4, at 3; accord ECF No. 61-3, PageID.666.) A rule resetting the initiation date at each mentor change would leave every multi-mentor fellowship without an anchor.

Defendant's anticipated rejoinder — that Schwartz's guidance was preliminary — does not survive its own record. Schwartz gave that guidance after Plaintiff's disclosure, not before it, and she never withdrew it.

The published charge is specific about where the dishonesty is said to lie: Plaintiff "[k]nowingly provided false data as part of their ASHA certification application." (ECF No. 45-2, PageID.508.) Every falsity Defendant has identified on the operative April 2024 application reduces to the October 17, 2022 start date itself (ECF No. 77, PageID.866; Pl.'s Opp'n Ex. H, ECF No. 86-9, PageID.2446-2457). The April 2024 application contains no field attributing supervision dates to a particular mentor, so the representation Defendant ascribes to Plaintiff — that Johannes "oversaw his mentorship from October 2022" — is one the application never requested and Plaintiff never made (Pl.'s Opp'n Ex. H, ECF No. 86-9, PageID.2446-2457; ECF No. 71-3, PageID.769).

Defendant's anticipated fallback — that ASHA alone determines when a Clinical Fellowship begins, "not by state regulations" (ECF No. 84-1, PageID.948) — does not rescue the charge; it destroys it. If the start date is an objective fact, the 2022 record establishes it. But if it is a determination reserved to ASHA, an applicant's date entry is a submission awaiting that determination — and a submission awaiting determination cannot be "false data," much less

knowingly false. On that theory, Defendant's remedy for a date it disputed was to reject the application. It did the opposite: it inquired of the verifying mentor — an inquiry its own application did not authorize. Three days after making it, its Director of Certification Operations circulated proposed affidavit text — staged on Defendant's development site and offered "if approved" — permitting ASHA to "audit your application, which may include request(s) for additional evidence from you and/or other relevant third parties." The operative April 2024 affidavit contained only the four terms lettered A through D (Ex. 15, Bates 000465; Pl.'s Opp'n Ex. H, ECF No. 86-9, PageID.2446-2457). It received the mentor's written confirmation of the October 17, 2022 start on June 24, and made its determination the next day by granting certification (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426; Pl.'s Opp'n Ex. D, ECF No. 86-5, Bates 000424). Its Chief Certification Officer framed that choice the day before, in writing: if the mentor "continues to confirm Oct 2022, I feel like we have to certify because we don't have a way to confirm or debunk." (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426.) Its system did have a way to confirm: the mentor verification its own process prescribes, and that confirmation was in hand. What Defendant lacked was a way to debunk it. On neither branch is there a lie.

3. The documentary record is one-sided. On Plaintiff's side: two state agencies, his employer, the signing mentor, Defendant's own Clinical Fellowship Portal, Defendant's own discovery admissions (ECF No. 77, PageID.865-869), and the written answer Plaintiff's mentor gave when Defendant itself asked — "Rodney started his CF experience on 10/17/2022 . . . ." (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426.) On Defendant's side: the after-the-fact assertion of one official who was not present at Plaintiff's placement, who entered the thread eighteen hours after Defendant's own certification staff had confirmed the contrary, whose factual premise — that Plaintiff had seen no clients in 2022 — was her own assumption, posed as a question she

answered herself (ECF No. 38-1, PageID.416), and whose position Defendant has never anchored to any written standard (ECF No. 38-1, PageID.415-417; ECF No. 42-8, PageID.483). That the portal entries were self-reported does not assist Defendant: the fellow reports, the mentor verifies, and verification is the reliability mechanism Defendant built. Johannes verified the start date and 1,450 hours through the portal and confirmed the same dates in writing when asked (ECF No. 29-16, PageID.351). An applicant fabricating a start date cannot conjure matching state licenses, a matching employment contract, and matching third-party confirmations to go with it. Where the entire contemporaneous record points one way and the only contrary evidence is an after-the-fact characterization untethered to any written rule, no reasonable factfinder could find a 2023 initiation. See *Anderson*, 477 U.S. at 248; *Matsushita*, 475 U.S. at 586–87.

The emails that follow are before the Court as full, unaltered Internet message headers, authenticated by declaration under 28 U.S.C. § 1746: Plaintiff retrieved each set from his own account using the provider's "Show original" function, which displays the complete headers generated by the transmitting mail servers — Message-ID, Date, From, To, and where available SPF, DKIM, and DMARC — and altered nothing (ECF No. 85, PageID.957-965). He offers them for the dates and senders the headers themselves record. Fed. R. Evid. 901(a), (b)(4); Fed. R. Civ. P. 56(c)(4). The third-party correspondence can in any event be presented in admissible form through the declarants' testimony, Fed. R. Civ. P. 56(c)(2), and much of it is offered not for its truth but for what was communicated to Plaintiff during the fellowship — the foundation of his good faith.

On October 13, 2022 — inside the period Defendant says no fellowship existed — Plaintiff's employer wrote to introduce his Clinical Fellowship mentor: "I am excited to introduce you to

your new CF mentor. Please meet Laura Syme. Laura has agreed to supervise your CF!!" The same message explained the licensure arrangement: because Ms. Syme's New Mexico license had not yet posted, "we wanted you to be able to get the ball rolling with your own licensure application and Victoria Hanawalt has graciously agreed to sign off on your application so you can submit it!! Victoria will be the temporary supervisor on record for your license," and "[o]nce Laura's license posts, we can notify the licensing board of the change in supervision." (ECF No. 85-10, PageID.1188.) An employer does not assign a Clinical Fellowship mentor, name a temporary supervisor of record for a state license, and plan the transfer of that supervision with the licensing board unless a Clinical Fellowship is the thing being started. The message predates the October 17, 2022 effective date of Plaintiff's employment agreement, and every arrangement it describes was made in October 2022 by the employer, the mentor, and the supervisor of record. None of them was Plaintiff.

December looks the same, and this time the words are the school district's. On December 12, 2022, Victoria Hanawalt — Albuquerque Public Schools' SLP TelePractice Manager — wrote to Plaintiff: "I am checking in to see how you are and what you are working on today. I would appreciate you getting the APS email account activated … Send me an email when you have activated the email and have signed into Synergy, and we can compare notes on what to have you working on to set up your clinic. Please stay in immediate and frequent contact with your CFY Supervisor for ALL things clinical, and I will be assisting you with APS systems set up and use. Did you watch the MaxCapture training videos that you were sent?" (ECF No. 85-20, PageID.1453.) Four days earlier she had answered Plaintiff's question about the coming standards directly, confirming he could complete the CFY as a TeleSLP "since [he] began the CF experience before 12/31/2022" (ECF No. 1-5, PageID.22; raw message source at ECF No. 85-19,

PageID.1450). In December 2022 Plaintiff was setting up his clinic with the district's assistance and was directed to his CFY Supervisor "for ALL things clinical," while the district assigned him its training modules and confirmed in writing that he had begun the CF experience before the cutoff. Defendant's position requires this Court to find that none of it was a Clinical Fellowship. Between those two dates the employer said it in a word. On November 8, 2022, introducing Plaintiff to a new mentor after what it called "some unforeseen changes," Stepping Stones wrote: "Marlaina, Please meet Rodney Wright! Rodney will be a tele-CF with Albuequerque [sic] Public Schools! He has already started his licensure application with Victoria Hanawalt (copied on this email) as the temporary supervisor on record." The next day Ms. Hanawalt added: "we will need to process to make the transfer to the permanent supervisor happen with the NM RLD SLP Board." (ECF No. 85-16, PageID.1279-1286.) Defendant's position is that in November 2022 there was no Clinical Fellowship. Plaintiff's employer, his temporary supervisor of record, and his incoming mentor were at that moment corresponding about his Clinical Fellowship, arranging to transfer his supervision of record with a state board, and calling him a CF.

State law fixes the same boundary. New Mexico's official CFY Plan instructs, in capital letters, that "CFY HOURS START ACCUMULATING ON THE DATE YOUR LICENSE IS ISSUED – NOT THE ESTIMATED DATE" (ECF No. 1-3, PageID.18), the plan New Mexico requires an applicant to file under N.M. Admin. Code § 16.26.2.17(B). New Mexico's scheme starts the CFY clock at license issuance — and what the State issued was not a general practice license but a Clinical Fellow license, expiring "1 YEAR AFTER INITIAL LICENSURE" and renewable only on proof of passing the national examination. (ECF No. 1-3, PageID.18.) Defendant's dating makes that scheme incoherent: on its account, the Clinical Fellow license New Mexico issued on November 23, 2022 — which the State's verification shows, as renewed, running to November

23, 2024 (ECF No. 61-4, PageID.668) — spent months authorizing a fellowship that had not begun, even though the State starts the clock at issuance. And both placements ran under one continuous New Mexico Clinical Fellow license, SLPCF22006. Defendant's own published words tie its standards to that event: its Clinical Fellowship page states that "[t]he CF cannot begin until conferral of master's degree and appropriate state licensure" (Ex. 4, at 2), and its COVID-era guidance states that its accommodations "are for purposes of ASHA certification only and do not supercede state licensing requirements" (ECF No. 61-2, PageID.662). Defendant nonetheless tells this Court, in bold, that its requirements are governed by its own standards "and not by state regulations." (ECF No. 88, PageID.2475.) The Rule Plaintiff was charged under says otherwise: as printed in the Board's own approved minutes, Principle II, Rule B permits clinical services consistent with state law (ECF No. 61-6, PageID.676). A defendant whose charged rule conditions practice on compliance with state law cannot tell this Court that state regulation is irrelevant to it. Neither New Mexico nor Ms. Hanawalt is offered as an interpreter of Defendant's standards; each is offered as a witness to a date.

4. The 80/20 requirement is a composition requirement, not an initiation gate. Defendant's position reduces to the claim that Plaintiff's fellowship could not have begun in 2022 because his early weeks involved onboarding and training rather than direct client sessions (ECF No. 80, PageID.884). But Defendant's own certification department described the percentage as an average, not a daily threshold. Answering Plaintiff's question about his start date, it wrote that he need only "on average" have "80% of [his] work week in direct clinical contact." (ECF No. 1-6, PageID.26.) An average is not a threshold that must be met on the first day. Defendant's own standards treat the direct-contact percentage the same way: as a requirement about the composition of the fellowship as a whole — which hours count toward the 1,260-hour total —

not as a precondition for the fellowship to exist (ECF No. 61-2, PageID.658-665; ECF No. 61-3, PageID.666; ECF No. 77, PageID.865).

5. Defendant's own Guide: an uncounted partial segment is still part of the Clinical Fellowship. Whether the 2022 time earns credit is a different question from when the fellowship began, and only the second is before the Court. The 2022 work was onboarding, credentialing, systems access, district training, and clinic setup; there were no clients yet. Defendant's own Guide places that work inside the fellowship rather than before it: up to 20% of the experience "may be spent doing other activities such as attending in-services or providing trainings and presentations." (Ex. 4, at 2.) The 80/20 split is a composition requirement measured across the whole experience, not a gate that must be cleared on day one. Defendant's rule says what an unmet supervision requirement does: the time does not "count toward your CF." (Ex. 4, at 4.) It does not say the experience never began. Defendant's Guide addresses this exact situation under the heading "Clinical Fellow Changes Settings/Employers Between Segments": "In order for hours/experiences to be counted," six hours of direct and six hours of indirect supervision "per segment (or part-segment) must be completed by each CF mentor." (Ex. 4, at 6.) That rule is written for a fellow who changes employers, and it reaches each "segment (or part-segment)." Defendant knew that is what happened: on October 6, 2023 its Director of Clinical Certification wrote to the Chief Certification Officer, "He changed employers and mentors," answering his question whether "the setting change[d] or just the mentor" (Ex. 2, Bates 000369). It presumes the fellowship continues across the change, and the consequence it states is that hours are not counted. It does not provide that the fellowship begins again. The sentence that follows addresses Plaintiff's situation exactly — a Clinical Fellow who "completes a partial segment that did not include at least 6 hours of direct and 6 hours of indirect supervision from their CF mentor prior

to changing settings/employers" — and states a single consequence: "the new CF mentor cannot make up any supervisory hours that were deficient from the previous setting." (Ex. 4, at 6.) The Guide's own verb is "completes": a fellow who received less than the supervisory minimums has still, in Defendant's own words, "complete[d] a partial segment" — and whether the shortfall was in direct hours, indirect hours, or both, the segment exists as part of the fellowship. Defendant may answer that this provision presupposes a fellowship already validly begun. The answer is circular, and Defendant's own page closes it: the Guide defines the unit on the same page as "a segment is equal to one-third of the CF experience" (Ex. 4, at 6), so a partial segment is a fraction of a third of a Clinical Fellowship — a unit with no meaning outside one. Gallagher drew the same line in the message that first told Plaintiff his 2022 start did not count, describing the Stepping Stones period as "a partial segment for purposes of your CF report" — a segment of the report, not a nullity outside it (ECF No. 38-1, PageID.416). And Defendant's own system recorded the same thing: mentor, site, and segment all validated, with an effective segment start of 10/5/2022 — and it credited the period, computing "total credited weeks: 1.00" and "total credited hours: 15.00" (Ex. 10, Bates 000604). Defendant's own Guide sets the threshold for a countable week at "a minimum of 5 hours per week" (Ex. 4, at 2). Defendant's system applied that rule to 2022 and credited a week of Clinical Fellowship experience. A week of a fellowship cannot be credited before the fellowship exists. The credited period ran through December 13, 2022; Plaintiff attended district new-hire training on December 8, 2022 (Ex. 6; Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2420); the employer's Outlook directory card visible on his screen during that session identifies him as a "CF Speech Language Pathologist - TELE," captured at 12:04 p.m. on 12/8/2022 (Pl.'s Opp'n Ex. K, ECF No. 86-12, PageID.2460); and at 3:58 p.m. that same day his supervisor of record confirmed the fellowship in writing (ECF No. 1-5,

PageID.22). A fellowship whose first segment yields no creditable hours is one that began and earned nothing that segment — not one that never began.

Defendant's own page states one academic precondition for starting: the experience "may be started only after all academic coursework and supervised clinical practicum have been completed and verified by your graduate program director . . . ." (Ex. 4, at 3; accord ECF No. 61-3, PageID.666.) Plaintiff's degree was conferred in 2002 — a fact Defendant's own synopsis recites (Ex. 1, Bates 000417), and Defendant's own internal Clinical Fellowship report screen carries the verified academic-and-practicum completion date on its face: "a&p completion date: 5/13/2002" (Ex. 10, Bates 000604). That precondition was satisfied twenty years before the fellowship began, on Defendant's own record. The district trainings in the record fall in the Guide's 20% "other activities" category by name — "attending in-services" (Ex. 4, at 2).

Reading the fellowship to begin only when creditable hours accrue would mean no Clinical Fellow could know which telepractice rules governed his fellowship until Defendant later decided whether his early hours counted — a rule-selection trigger operating only in retrospect. Cf. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Defendant's reading also turns on a fact that could not change the result: Defendant's own portal reports the fellowship as 58 weeks and 1,450 mentor-verified hours against a 1,260-hour requirement (ECF No. 29-16, PageID.351). A dispute must be material to be genuine. *Anderson*, 477 U.S. at 248.

The parties do not disagree about the events, only about what to call them. Plaintiff executed an employment agreement effective October 17, 2022; performed onboarding and compliance work under it; attended district trainings beginning December 8, 2022 (Ex. 6; Pl.'s Opp'n Ex. K, ECF No. 86-12, PageID.2460); received a caseload; lost the placement when it was cancelled before client sessions began; and continued the fellowship at a new placement from February 2023.

Defendant's own submissions narrate those events in the same terms (Ex. 1, Bates 000417; Pl.'s Opp'n Ex. B, ECF No. 86-3, Bates 000105–000106). The employer's contemporaneous records state that Plaintiff's "employment status has been updated to 'displaced.'" Its handbook applies that status whenever an employee is "without an active assignment," and uses it "to redirect the employee to another assignment." Employment ended January 31, 2023 only after no replacement assignment was found (ECF No. 61-7, PageID.684-685; ECF No. 84-2, PageID.954). The redirection was not hypothetical: on December 29, 2022 and again on January 11, 2023 — inside the window Defendant treats as the end of the fellowship — Stepping Stones sent Plaintiff Zoom invitations for interviews with Gallup McKinley County Schools, each with a subject line beginning "Rodney Wright, CF-SLP Interview." (Ex. 8.) Asked to admit that it possesses no written communication from Plaintiff or from Stepping Stones stating that the 2022 Clinical Fellowship was "cancelled," Defendant answered "Denied," identifying only Plaintiff's own September 12, 2023 email saying "the assignment was cancelled at the last minute" — a statement about the assignment, not the fellowship (ECF No. 77, PageID.868; ECF No. 84-1, PageID.948). Elsewhere Defendant located the cancellation somewhere else entirely, treating Plaintiff's December 2023 request to cancel his dues and "membership account" as a withdrawal of his certification application (ECF No. 84-1, PageID.948, 951). Neither event is a cancellation of a Clinical Fellowship, and Defendant has never settled on which one it means. It did admit that it possesses no documentation from either the district or the employer that Plaintiff's 2022 orientation and professional training did not occur (ECF No. 77, PageID.869), and Standard VII expressly contemplates completion in multiple segments with more than one mentor (ECF No. 61-3, PageID.666). What Defendant disputes is not the events but whether its own undefined term "initiated" attaches to them — and when the material historical facts are agreed and the

disagreement concerns only their legal effect under the standard-setter's own undefined vocabulary, there is nothing for a jury to find. Fed. R. Civ. P. 56(a); cf. *Perrin v. United States*, 444 U.S. 37, 42 (1979). The finding requested moots any quibble over the precise October date: even the Stevenson letter in Defendant's own complaint file records that Plaintiff "began attending trainings with the school district on 12/8/22," and states the conclusion outright: "The start date for Roderick's assignment was 12/8/22." (Pl.'s Opp'n Ex. B, ECF No. 86-3, Bates 000105.) Whether the fellowship initiated on October 17, on November 23, or on December 8 of 2022, it initiated in 2022.

6. Defendant has no admissible evidence on the other side of the ledger. A fact is not "genuinely" disputed merely because the opposing party disputes it; the dispute must be supported by evidence capable of being presented in admissible form. Fed. R. Civ. P. 56(c)(1)(A), (c)(2); *Anderson*, 477 U.S. at 248; *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *Celotex*, 477 U.S. at 323. Defendant's entire 2023-start narrative rests on a single source: ECF No. 38-1, an internal Board of Ethics "Review and Motions Form" built on Gallagher's September 2023 characterization — a staff-prepared, unsworn narrative summary, cited and re-cited as "Id." through more than two pages of Defendant's brief (ECF No. 80, PageID.884-886); every later Defendant-side recitation of a 2023 start traces to it. No declarant has attested to its contents under penalty of perjury, and no declaration or deposition of Gallagher, Stevenson, or Johannes appears anywhere in the record — and fact discovery has closed. Defendant's motion is supported by three exhibits — complaint material, the ICH decision, and supplemental complaint material — none a declaration (ECF Nos. 80-1, PageID.909-913; 80-2, PageID.914-916; 80-3, PageID.917-919). By contrast, the internal ASHA emails Plaintiff relies on are Defendant's own statements through its officials, admissible against it under Fed. R. Evid. 801(d)(2)(D); when

Defendant offers those same characterizations for their truth, they are hearsay in its hands. Nor could after-the-fact declarations cure it: a declaration carries only what its declarant personally knows, Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602, and no ASHA official has personal knowledge of what Plaintiff did at his placement between October 2022 and January 2023.

**V. Conclusion**

For these reasons, Plaintiff respectfully requests that the Court enter an order under Federal Rule of Civil Procedure 56(g), or in the alternative a declaratory judgment, establishing that Plaintiff's Clinical Fellowship initiated no later than December 31, 2022, and treating that fact as established in this case; and grant such further relief as the Court finds appropriate.

Respectfully submitted,

Dated: August 12, 2026

/s/ Roderick Wright

Roderick Wright

6181 Lake Michigan Drive, #103

Allendale, MI 49401

(616) 990-9284

wrightiir@yahoo.com

Plaintiff, pro se

**CERTIFICATE OF COMPLIANCE**

Pursuant to LCivR 7.2(b)(ii), I certify that this brief complies with the word-count limitation set forth in LCivR 7.2(b)(i). This brief contains 10,672 words, excluding the case caption, the

signature block, attachments, and exhibits. The word count was generated by Microsoft Word for Microsoft 365.

Dated: August 12, 2026

/s/ Roderick Wright

Roderick Wright

6181 Lake Michigan Drive, #103

Allendale, MI 49401

(616) 990-9284

wrightiir@yahoo.com

Plaintiff, pro se