UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

RODERICK WRIGHT,

Plaintiff,

v.

AMERICAN SPEECH-LANGUAGE-HEARING ASSOCIATION,

Defendant.

Case No. 1:25-cv-01367-PLM-MV

Hon. Paul L. Maloney

# PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNT III

## I. Introduction

Count III is a narrow claim. It does not ask the Court to weigh professional standards or to substitute its judgment for Defendant's. It asks whether Defendant, in revoking a certification it had granted after its own review, followed the written Practices and Procedures it wrote for itself — and it asks that question on a record Defendant's own officials assembled, drafted, and pre-resolved before the Board ever voted.

Defendant's own internal record establishes the claim without regard to how the initiation question is resolved. The Board of Ethics decided on a record that was materially incomplete and materially wrong, under an initiation rule that exists nowhere in Defendant's writings — every element proved by Defendant's own files. Nor does resolving the initiation question require crediting Plaintiff's account over Defendant's: Defendant's own published Guide treats an under-supervised partial segment as a completed part of the fellowship, which makes the staff's "will

not count" — the whole of its reasoning behind the 2023 date — a crediting consequence, not a start date (Ex. 4, at 6).

**II. Statement of Undisputed Material Facts**

Plaintiff incorporates by reference the Statement of Undisputed Material Facts set out at Section II of the brief supporting his separately filed Motion Under Fed. R. Civ. P. 56(g), which establishes the documentary record on the initiation date and is not repeated here. The facts stated below concern the ethics proceeding itself.

Defendant's Senior Director of Ethics, Katharine Meyer, pre-judged the case. In an August 6, 2024 "ethics consult" — before any complaint was filed — she told certification leadership that Plaintiff "clearly did not meet the requirements for certification," and that he had "engaged in dishonestly [sic] by submitting an application – under a different name –" (ECF No. 71-4, PageID.770). On May 11, 2025 she wrote to the panel reviewer that "I don't think there is another option other than revocation," listed the possible violations, and designed the sanction: "we could revoke him for a short period of time, and then reinstate him." (ECF No. 71-3, PageID.769.) The panel's "Review and Motions Form" for the June 14, 2025 hearing arrived containing pre-drafted findings of violation and a pre-drafted sanction — "Revocation of Membership and Certification for six (6) months (public)." (ECF No. 61-6, PageID.678–683.) That sanction was boilerplate. The same page that identifies Plaintiff as "a non-member certified in speech-language pathology" proposes revoking his "Membership and Certification" (ECF No. 38-1, PageID.418).

Plaintiff told the Board that it had been given less than the whole document. Defendant's own Review and Motions Form records that Plaintiff "alleged that the Complainants' supplemental materials only contained a partial version of an email chain between the Respondent and Ms.

Hanawalt, which included Ms. Hanawalt's entire confirmation that the Respondent would 'be able to complete [his] CFY experience as a TeleSLP since [he] began the CF experience before 12/31/2022.'" (ECF No. 61-6, PageID.681.) What Plaintiff was describing was not a missing message in a thread. It was a single page on which the operative sentence had been cut off mid-word. Defendant's supplemental complaint material contains two copies of that page — one a photograph of a printed page, the other a printout of the mail client bearing its own 9/12/23 print header — and each ends the line at "Yes, you will be able to complete your CFY experienc[e]," with the line beneath it reading only "12/31/2022." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2418, 2426 (Bates 000103, 000111).) Plaintiff had sent the email twice, and the message transmitting the second copy says why: "Just in case you did not get the memo. I have included it here." (Id., PageID.2425 (Bates 000110).) The Board never addressed that objection. The Board's own approved minutes print Principle II, Rule B in full — clinical services must be "consistent with current local and state laws and regulations and with ASHA certification requirements" — and then, in the operative rationale on the same page, quote the Rule back with the state-law clause removed (ECF No. 61-6, PageID.676). Meyer told Plaintiff's counsel that "in the Board of Ethics' view, Ms. Gallagher's emails superseded those you received from Ms. Schwartz and any other individuals who are not ASHA employees (including Ms. Hanawalt)"; that position was never given to Plaintiff in writing (ECF No. 42-8, PageID.483).

Panel 2 found the violations by a vote of 7–0 on June 14, 2025 (ECF No. 61-6, PageID.675-677). Seven days before the Board's scheduled further-consideration discussion, Meyer wrote to the panel's reviewer that counsel's brief could get "a quick summary in the FCH section" and that "there will be no actual hearing." (ECF No. 71-2, PageID.768.) The full Board affirmed 13–0, verbatim (ECF No. 38-2, PageID.421-422; ECF No. 61-6, PageID.672-673). On January 23,

2026, Defendant published on its website, The ASHA LeaderLive, that Plaintiff's certification was revoked, effective January 20, 2026, because he "Knowingly provided false data as part of their ASHA certification application." The same publication records that Plaintiff's mentor, Rachel Ann Johannes, had already been censured, effective December 10, 2025 — six weeks before Plaintiff — because she "Affirmed on a Clinical Fellow's mentor verification form that a Clinical Fellow began their Clinical Fellowship (CF) approximately four (4) months before the Respondent started supervising the individual." (ECF No. 45-2, PageID.507-509.)

**III. Standard of Review**

Summary judgment is appropriate where the record shows no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute is "genuine" only if a reasonable factfinder could return a verdict for the nonmoving party on that issue, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If complete summary judgment cannot be granted, Rule 56(g) authorizes the Court to "enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); see also Fed. R. Civ. P. 56(f).

**IV. Argument**

Section A states the governing standard and why Defendant's authorities do not reach this case. Section B shows that Defendant's own published Guide forecloses its initiation theory. Section C applies the standard to Defendant's own record.

**A. The governing standard, and why Defendant's authorities do not reach this case.**

The Sixth Circuit recognizes that "'quasi-public' professional organizations and accrediting agencies such as the ABA have a common law duty to employ fair procedures when making decisions affecting their members." *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 711 (6th Cir. 2006). Review asks whether the decision "is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence," id. at 712–13, and "[a]n abuse of discretion can only be found if no evidence supports the decision or if the agency misapplied the law," id. at 713. The deference Defendant invokes attaches to the substance of its standards, not to the fairness of its process: "great deference should be afforded the substantive rules of these bodies and courts should focus on whether an accrediting agency such as the ABA followed a fair procedure in reaching its conclusions." Id. The court affirmed because "the ABA afforded Cooley all due process," id. at 707, and identified what the school had failed to show: "Cooley has not argued that the decision to delay contradicted ABA rules or established policies," id. at 716. *Cooley* never tested the principle that a body must follow its own rules; the school never claimed the ABA had broken one. Plaintiff claims exactly that, and identifies the prejudice each departure caused.

Defendant will invoke the substantial-evidence half of that standard, but the standard asks whether evidence supports the finding actually made, and each finding must be taken on its own terms. The Principle II, Rule B finding rests, in every document that issued, on "the Respondent exceeding the 25% telepractice limit of direct client contact hours during the application process" — a limit that applies, by Defendant's own published guidance, only to fellowships beginning on or after January 1, 2023 (ECF No. 61-5, PageID.670). That cap also cannot be squared with the placement itself. Plaintiff was engaged to serve New Mexico students by

telepractice; the employer's directory card identifies him as a "CF Speech Language Pathologist - TELE" (Pl.'s Opp'n Ex. K, ECF No. 86-12, PageID.2460). A 25% telepractice cap would have made that fellowship impossible on its first day — which is why the question was put to Defendant's certification department before it began, and why Plaintiff's supervisor of record answered in writing that he could complete it "as a TeleSLP since [he] began the CF experience before 12/31/2022" (ECF No. 1-5, PageID.22). The Principle IV, Rule E and Rule G findings rest on "knowingly providing false data." Knowledge is an element of both, and the only evidence Defendant has identified is that Gallagher told Plaintiff his start date was 2023 — while the same official wrote privately that "[t]he CFCC may very well approve it once appealed" (Ex. 2, Bates 000369), Defendant's own analyst wrote that the mentor's account was "corroborated by what Roderick already put in writing to us previously" (Ex. 7, Bates 000379), and its Chief Certification Officer answered the mentor's confirmation of the 10/17/2022 date with "Thank you for this confirmation" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2394). Defendant has never identified any other evidence of knowledge. Set against Gallagher's characterization is a documentary record Plaintiff neither created nor controlled: the employment agreement's "planned start date of 10-17-2022" (ECF No. 1-2, PageID.12); the CFY Plan Ms. Hanawalt signed on October 14, 2022, naming an October 17, 2022 beginning date (ECF No. 1-3, PageID.18); Clinical Fellow license SLPCF22006, issued November 23, 2022 (ECF No. 61-4, PageID.668); the New Mexico Public Education Department license issued December 28, 2022 (Pl.'s Opp'n Ex. M, ECF No. 86-14, PageID.2462); the mentor's written answer when Defendant itself asked — "Rodney started his CF experience on 10/17/2022" (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426); the employer's verification of full-time Clinical Fellow employment (ECF No. 84-2, PageID.954); and Defendant's own portal entry, "Start Date: 10/17/2022" (ECF No.

29-16, PageID.351). On the other side is one official's characterization, first advanced in September 2023, that Defendant has never anchored to any written standard. Substantial evidence is a floor, not a formality; a finding of knowing falsity cannot rest on the assertion contradicted by every contemporaneous document in the file.

In this brief every proposition drawn from a decision is quoted with a pinpoint citation or identified as Plaintiff's own characterization.

Defendant's second authority supplies the Michigan rule and draws the dispositive distinction. In *Foundation for Interior Design Education Research v. Savannah College of Art & Design*, 244 F.3d 521 (6th Cir. 2001), the Sixth Circuit held that "Michigan law controls," id. at 527, and identified the governing authority as *Maitland v. Wayne State University Medical School*, 76 Mich. App. 631, 257 N.W.2d 195 (1977), in which "[t]he Michigan court reviewed the defendant's actions for arbitrariness, capriciousness, and denial of procedural due process." 244 F.3d at 528. Discussing *Dietz v. American Dental Ass'n*, 479 F. Supp. 554 (E.D. Mich. 1979), the court explained that *Dietz* "involved a challenge by an individual denied membership in a medical association," and that in such a case a court "should not afford great deference." 244 F.3d at 528. The court's task is to "determine whether the procedure was fair and whether arbitrary factors were used to determine the result." Id. at 528–29. *Dietz* states the trigger: "Where a professional association has monopoly power and membership in the association significantly affects the member's practice of his profession, courts will hold the association has a fiduciary duty to be substantively rational and procedurally fair. The association must exercise its powers according to its by-laws and constitution." 479 F. Supp. at 557. The trigger is not that the credential is legally compelled; it is that it "significantly affects the member's practice."

The authorities *Dietz* relies on are stronger still. *Marjorie Webster Junior College v. Middle States Ass'n of Colleges & Secondary Schools*, 432 F.2d 650 (D.C. Cir. 1970), holds that "[w]here membership in, or certification by, such an association is a virtual prerequisite to the practice of a given profession, courts have scrutinized the standards and procedures employed by the association," id. at 655, and that "the extent to which deference is due to the professional judgment of the association will vary both with the subject matter at issue and with the degree of harm resulting from the association's action," id. at 655-56. The subject matter here is a calendar date, and the harm is revocation together with a permanent published finding of dishonesty. *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791 (1961), is to the same effect on closer facts: the physician held an unrestricted state license and membership was not legally required, yet the court looked to the association's "virtual monopoly … in fact" and held that such power "should not be unbridled but should be viewed judicially as a fiduciary power to be exercised in reasonable and lawful manner." 170 A.2d at 793, 799. The record establishes what *Dietz* requires. Defendant published the revocation to the profession (ECF No. 45-2, PageID.507-509). Its own decision documents reserve the power to provide the Final Decision "to any state agency that has provided the Respondent a license or credential" (ECF No. 80-2, PageID.915), and its Ethics office did so here, transmitting the Final Decision to the New Mexico licensing board on January 21, 2026 — the day after the revocation took effect. The board's reply describes the transmission in its own words: it acknowledged being "in reciept [sic] of your complaint against Roderick Wright," and it opened a compliance case against Plaintiff (ECF No. 88-1, PageID.2486; ECF No. 71-5, PageID.773). And its own portal fixed the outer limit for initiating a new fellowship — "until 4/13/2026" — a date that passed while the revocation stood (ECF No. 29-16, PageID.351). A body that can broadcast a finding of

dishonesty to the profession, deliver it to the member's regulator, and run out the clock on his only path back holds the power *Dietz* and *Falcone* describe.

A court in this circuit has applied these principles to a private board that certifies individual practitioners. In *Picard v. American Board of Family Medicine*, No. 1:13-cv-14552 (E.D. Mich. Apr. 9, 2014), ECF No. 17, the court applied the *Dietz* trigger and held that because "[w]hether Picard is ABFM-certified could significantly affect Picard's profession, . . . ABFM has a fiduciary duty to be substantively rational and procedurally fair," id. at 17; Picard had stated a "colorable claim for common law due process violation under Michigan law," id. at 18. Plaintiff notes candidly that the same court later granted that board summary judgment, and the reason is the distinction this case turns on: the board's factual premises were documented and true, so its decision was "supported by the evidence and thus was substantively rational." *Picard*, ECF No. 66, at 14-15 (Oct. 22, 2015). The premise on which Defendant acted — that Plaintiff's fellowship began in 2023 — is contradicted by Defendant's own contemporaneous records.

One Michigan decision has addressed *Dietz*, and read in full it favors Plaintiff. In *Christensen v. Michigan State Youth Soccer Ass'n*, 218 Mich. App. 37, 553 N.W.2d 638 (1996), a suspended youth-soccer coach invoked *Dietz* and lost, on grounds that do not exist here. He "failed to exhaust his internal remedies," having "elected not to avail himself" of an available appeal, id. at 40; Plaintiff exhausted his. The coach also "failed to bring forth evidence that the MSYSA is a professional association with 'monopoly power' or that membership 'significantly affects' a member's practice of his profession," id. at 43; here the record supplies both. And the court's disagreement with *Dietz* was confined to a constitutional question, id. at 42; Plaintiff asserts no constitutional claim.

Plaintiff completed every step of Defendant's internal review: the Initial Determination, through counsel, decided 7–0 (ECF No. 80-2, PageID.914-916; ECF No. 61-6, PageID.675-677); Further Consideration, through counsel, affirmed 13–0 (ECF No. 38-2, PageID.421-422; ECF No. 61-6, PageID.672-673); and a written December 2, 2025 appeal to Defendant's Ethics Appeal Panel on the two grounds Defendant's own rule specifies — an appeal Defendant does not contend was required (ECF No. 38-2, PageID.422; Ex. 12, Bates 000063, 000065-000066). Defendant identifies no further internal review that was available and unused. Unlike the coach in *Christensen*, who "elected not to avail himself" of an appeal that existed, 218 Mich. App. at 40, Plaintiff used every step Defendant offered.

What *Christensen* accepted is the rule Plaintiff invokes: "all Dietz says is that in cases involving disciplinary actions by professional associations, due process requires notice and an opportunity to be heard." Id. at 43. The court found that satisfied on facts Defendant cannot match — the coach "was, in fact, provided with full notice of the charges," and "a hearing was held … and plaintiff had the opportunity to present his own version of the events." Id. *Christensen* also supplies the measure of what is owed: a member of a private association is entitled to the "due process" "provided for by the rules and bylaws of the organization itself." Id. at 41. That measure is Defendant's own rulebook — and on this record the rationale that decided the case never reached Plaintiff in writing, the power to request the complete Hanawalt email was never used, and the objection that the Board had a partial record was never addressed.

A federal court in this State applied that principle in March 2025, holding an institution's own written policies "relevant to the question of whether the dismissal was arbitrary" and a "failure to comply with its own policies" a factor that "weighs heavily in favor of finding that the decision

was arbitrary." *Doe v. Univ. of Detroit Mercy Sch. of Dentistry*, No. 24-cv-11106, 2025 U.S. Dist. LEXIS 60856, at *18 (E.D. Mich. Mar. 31, 2025).

*Dietz* also identifies the line that determines how much deference is owed, and Defendant is on the wrong side of it. Deference attaches to competence judgments — describing the practitioner in that case, Dr. Dietz, the court wrote: "The present case does not involve a disciplinary proceeding: [Dr. Dietz] was not rejected for failing to conform with rules and regulations. [He] was rejected because he allegedly was not qualified." 479 F. Supp. at 559. No comparable competence judgment was ever made about Plaintiff, whose application Defendant reviewed and granted. Disciplinary decisions are governed differently: "Where an exclusion or expulsion is for a disciplinary reason … courts have held that a professional association must give notice and an opportunity to be heard." Id. at 558. Defendant's Board of Ethics made no judgment about Plaintiff's clinical competence. It found him in violation of three Rules of its Code of Ethics — Principle II, Rule B, and Principle IV, Rules E and G — and revoked his certification. Unlike Dr. Dietz, who was turned away at the door on a judgment about his qualifications, Plaintiff applied, paid, and was granted the credential — and Defendant then revoked it for alleged rule violations. That is a disciplinary proceeding by *Dietz's* own definition, and it belongs on the side of the line where deference gives way to process.

*Maitland* supplies the Michigan standard, and the decision Defendant itself cites states the same principle: "courts focus primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision." *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 39 F. Supp. 2d 889, 894 (W.D. Mich. 1998), aff'd, 244 F.3d 521 (6th Cir. 2001).

With one exception, every case Defendant cites is an institution seeking accreditation — a law school, an interior-design program, a beauty academy, two colleges. This case is the other kind. Plaintiff is an individual whose professional credential Defendant revoked, and that certification significantly affects his ability to practice. The "great deference" Defendant asks for is the deference the Sixth Circuit reserves for institutional-accreditation cases — the deference *Foundation* itself says a court "should not afford" when an individual challenges a professional association's decision about him. 244 F.3d at 528. Its remaining authorities do not travel outside institutional accreditation either. In the fifty-nine years since *Parsons College*, 271 F. Supp. 65 (N.D. Ill. 1967), every one of the forty-six decisions citing it concerns a school, college, or training institution — not one an individual's credential. *Lieberman v. Am. Osteopathic Ass'n*, 620 F. App'x 470 (6th Cir. 2015), is unpublished, applies Illinois law, id. at 472, and cites *Dietz* with approval, id. at 474; the physician there lost because the rule he attacked was categorical — every osteopath first certified after 1997 held an eight-year certificate and had to pass a recertification examination, id. at 471-72 — and because a private association, like a government, may use a grandfather clause, id. at 474. That is the opposite of this record. Plaintiff does not challenge the content of Defendant's standards; he challenges Defendant's application to him of a standard Defendant's own published transition guidance said did not apply to him. The Sixth Circuit has addressed the other kind of case. *Lanier v. American Board of Endodontics*, 843 F.2d 901 (6th Cir. 1988), involved a Michigan practitioner denied certification by a private specialty board. Reversing dismissal, the court described the parties' dealings as having "looked to a contractual arrangement whereby the prestige of the Board's certification would be conferred upon Dr. Lanier in Michigan in consideration of her meeting the Board's criteria for certification eligibility." Id. at 906. It also refused to let the certification process be

"fragmented," treating "[t]he application, evaluation and rejection process" as "a mosaic of activity . . . every step of which was a constituent part of the whole." Id. at 908. *Lanier* was decided on personal jurisdiction, and Plaintiff cites it for nothing beyond the Sixth Circuit's characterization of what such a board and such an applicant are doing: the credential is conferred in consideration of the applicant meeting the criteria the board has published. Plaintiff met the criteria Defendant published — his mentor verified 1,450 hours against the 1,260-hour requirement, and Defendant reviewed the application and granted certification on June 25, 2024 (ECF No. 29-16, PageID.351; ECF No. 77, PageID.865) — and Defendant then applied a different criterion after the fact. In plainer terms, that is a bait and switch: the published criteria induced the application fee and a year of mentored clinical work; an unpublished criterion was then applied to strip the certification those criteria had promised, and which Defendant had already granted.

Count III is a Michigan common-law claim, pleaded as one (ECF No. 58, ¶¶ 34–39, PageID.602-603). Plaintiff moves on the grounds pleaded at ¶¶ 35–36 — the mischaracterized initiation date, the application of the wrong telepractice standard, and the incomplete and misleading information placed before the Board. He does not move on the accommodation ground pleaded at ¶ 37, which is reserved. This Court has original jurisdiction under 28 U.S.C. § 1332: Plaintiff is a citizen of Michigan, Defendant is incorporated and headquartered in Maryland, and the amount in controversy exceeds $75,000 (ECF No. 58, ¶ 1A, PageID.595). Jurisdiction does not depend on 28 U.S.C. § 1367(a) or on the disposition of any other count. Defendant's own lead authority confirms that state law governs. *Cooley* applied federal common law for a stated reason: the ABA is an accrediting agency approved by the Secretary of Education, and because the Higher Education Act vests exclusive federal jurisdiction over accreditation disputes, "[t]his

grant of exclusive federal jurisdiction necessarily implies that federal law should govern disputes relating to decisions made by those bodies." 459 F.3d at 712. The court expressly contrasted *Foundation*: "the agency in that case was not at that time approved by the Secretary of Education and thus was not subject to the HEA." Id. Defendant is not an accrediting agency approved by the Secretary of Education. Under the reasoning of the decision Defendant leads with, Michigan law governs, and the elements of a federal accommodation claim have no application to it.

Defendant may invoke the Sixth Circuit's order denying an injunction pending appeal, which stated that "all four counts in Wright's complaint depend on proving that he requested a reasonable accommodation during the ethics review process and that ASHA failed to provide it." (No. 26-1329, Doc. 19-1, at 3 (6th Cir. July 14, 2026).) That sentence describes the original complaint. The operative First Amended Complaint superseded it, and its ¶ 36 pleads grounds making no reference to disability (ECF No. 58, ¶ 36, PageID.602). The order resolved only a motion for an injunction pending appeal and expressly declined to reach the initiation-date argument; a preliminary-injunction ruling is not law of the case on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Michigan law also sets the threshold for review, and Defendant does not clear it. Judicial review of a private association's decision is withheld only "[w]here the association provides a speedy and effective means of deciding controversies before it and where there is no evidence of fraud or oppression by the association against the complaining member." *James v. Midland Cty. Agric. & Hortic. Soc'y*, 107 Mich. App. 1, 7, 308 N.W.2d 688, 690 (1981). The test is conjunctive, and Defendant fails both halves. The rationale that actually decided the case was never delivered to Plaintiff in writing, and his objection that the Board had been given a partial document went unaddressed through both stages (ECF No. 61-8, PageID.691). And the record supplies what the

second half contemplates — findings drafted a month before the hearing, a sanction selected before any vote, and a Senior Director of Ethics who ruled out any option but revocation before Plaintiff had been heard (ECF No. 71-3, PageID.769; Pl.'s Opp'n Ex. I, ECF No. 86-10, Bates 000249).

Defendant may also argue that review is confined to the file that was before the Board. The argument fails three times over. First, the record-limitation rule is an accreditation rule about institutions, appearing in the district-court decision Defendant itself cites, in a section addressed to denial of accreditation, and was applied there to a college seeking programmatic accreditation. 39 F. Supp. 2d at 894. *Dietz* supplies the rule for the other kind of case, and what *Dietz* requires is notice and an opportunity to be heard, 479 F. Supp. at 558, not appellate review on a closed file. Second, the Sixth Circuit's own exceptions describe this case precisely: supplementation is justified "when an agency deliberately or negligently excludes certain documents." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997); accord *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 464–65 (6th Cir. 2014). Plaintiff's documents are offered to prove the file was not complete. Third, Plaintiff asks the Court to credit no one's recollection — the distinction that decided *Picard*, where the court excluded deposition testimony because "[w]hat deponents may or may not testify about remembering years after the fact is not relevant to the question of whether a quasi-public professional organization acted arbitrarily … based on the information that was in front of it." *Picard*, ECF No. 66, at 12. Plaintiff offers Defendant's own contemporaneous writings, to establish exactly that: what information was in front of the Board — information Defendant was told was incomplete and had an express power to supplement (Practices and Procedures § II.G), and never did.

Distilled to its essential fact, this claim rests on a single theory: the Board of Ethics decided on a record that was materially incomplete and materially wrong, assembled by officials who had already chosen the outcome, under an initiation rule that exists nowhere in Defendant's writings. The Board voted on the information it was given — 7–0 on June 14, 2025, and 13–0 on further consideration. That information was incorrect in part and withheld in part, and both defects trace to the officials who assembled it. The case chronology was not compiled by a neutral fact-finder; it was authored by Katharine Meyer, Defendant's Senior Director of Ethics, and the timeline's native metadata proves it — "Authors: Katie Meyer," 118 revisions, nearly eight hours of editing (Pl.'s Opp'n Ex. J, ECF No. 86-11, PageID.2459). She sent that timeline to the hearing reviewer a month before the panel voted, under a cover message stating: "With regard to sanctions, I don't think there is another option other than revocation." (ECF No. 71-3, PageID.769.) Six features of the proceeding establish that theory, and they do not carry equal weight. Three are independently sufficient: the after-the-fact initiation rule, the incomplete record the Board was told was incomplete, and the impossible mentor chronology. The other three corroborate; Plaintiff does not need all six.

Defendant's obligations here are not abstract. The Board of Ethics operates under a written rulebook — the Practices and Procedures of the Board of Ethics (2024), which governs complaints filed between January 1, 2024 and April 30, 2025, which Defendant provided to Plaintiff with the complaint, and which Defendant invoked against him when it denied his appeal (ECF No. 80-2, PageID.916; ECF No. 80, PageID.888; Ex. 5). Three provisions decide this claim. Section II.G confines the Board to the parties' submissions: the Board "does not conduct independent investigations into complaints; it relies on the information provided by the Respondent, the Complainant, and publicly available resources. However, the Ethics Office may

reasonably request additional documentation from the Complainant and the Respondent related to the case." Section III.D.6 gives the Complainant one opportunity to submit "additional evidence or documentation," and the Respondent one final Second Response to rebut it. And Sections III.E.1 and III.F.6 state the Board's duty in identical terms at both stages: the Board "shall consider all information provided by the Complainant(s), Respondent, and publicly available sources." Defendant's own Terminology section removes any doubt: "May denotes an allowance for discretion; shall denotes something that is required." Read together, those provisions make the parties' submissions the entirety of the record: a Complainant who supplies a truncated version of the decisive document controls the outcome unless the Respondent's correction is considered — which Section III.F.6 requires, and which did not happen. *Dietz* states the consequence — the association must exercise its powers according to its by-laws — and this is the showing *Cooley* found missing: the school never argued the ABA had broken its own rules. Plaintiff argues exactly that, and quotes the rule.

**B. Defendant's own published Guide forecloses its initiation theory: an uncounted partial segment is still part of the Clinical Fellowship.**

The written rule that did exist forecloses Defendant's initiation theory at its root. Defendant's own Guide — its self-described "clarification of Standard VII" (Ex. 4, at 1) — addresses a fellow who changes employers mid-segment — which Defendant's own Director of Clinical Certification wrote is what happened here, "He changed employers and mentors" (Ex. 2, Bates 000369): "If a Clinical Fellow completes a partial segment that did not include at least 6 hours of direct and 6 hours of indirect supervision from their CF mentor prior to changing settings/employers, the new CF mentor cannot make up any supervisory hours that were deficient from the previous setting." (Ex. 4, at 6.) The Guide's verb is "completes": a segment

short of the supervisory minimums is still, in Defendant's own words, a completed partial segment of the fellowship, and the sole consequence its published text attaches is that the deficient hours are not counted. A partial segment is, by definition, part of a Clinical Fellowship already underway; Defendant's own description of the 2022 period as a "partial segment" recognizes it as such. Under Defendant's own Guide, the staff's "will not count" is where the analysis ends; it is not a lever that moves a start date. The dispute is therefore not whether the 2022 hours were creditable — Plaintiff has never claimed they were — but whether an uncreditable partial segment may be treated as though it never existed, and Defendant's own Guide answers that. Defendant may answer that the Guide's provision presupposes a fellowship already validly begun. That answer is circular, and Defendant's own documents close it. Its certification system validated the 2022 period as a segment — "Mentor is Okay," "Site is Okay," "Segment is Okay" — and credited 1.00 week and 15.00 hours (Ex. 10, Bates 000604); a week of a fellowship cannot be credited before the fellowship exists. The Guide defines that unit on the same page: "a segment is equal to one-third of the CF experience" (Ex. 4, at 6). None of the Guide's preconditions for starting is client contact: the experience "may be started only after all academic coursework and supervised clinical practicum have been completed and verified by your graduate program director" (Ex. 4, at 3), a condition Defendant's own internal certification record shows was satisfied twenty years before the fellowship began — "a&p completion date: 5/13/2002" (Ex. 10, Bates 000604). And Defendant's own Director of Clinical Certification applied that category to this period, calling it "a partial segment for purposes of your CF report" (ECF No. 38-1, PageID.416). Even read as addressing only crediting, the Guide cannot carry Defendant's conclusion. A credentialing body may decide what time counts; converting a crediting deficiency into a moved start date — and then into knowledge of falsity — requires a

written rule, and Defendant has never produced one. On that narrower reading the result is the same: treating an under-supervised period as a "partial segment" makes Defendant's contrary interpretation at least unreasonable, and defeats any finding that Plaintiff knowingly entered a false start date when he described the period in Defendant's own published terms.

**C. Defendant's own record establishes the claim.**

First, the operative rule was created after the fact. As shown in Section A, Defendant applied a direct-client-hours-first initiation rule that its own staff contradicted in writing and that its own discovery responses admit is not in its standards (ECF No. 77, PageID.865; ECF No. 38-1, PageID.415-417). Defendant described the mechanism itself at the time, in consecutive sentences of one October 5, 2023 email: "[T]he time spent under the mentorship of Ms. Stevenson will not count toward the clinical fellowship experience, which moves the start date of your clinical fellowship experience later than January 1, 2023. This means that to be eligible for ASHA certification you will need to complete at least 75% of your time in care and care management via direct, onsite, inperson service delivery. Up to 25% of the fellowship experience can be earned via telepractice." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2424.) As Section B establishes, the written rule that did exist forecloses the first step.

There is a further problem with that rule, independent of its content: no one with authority to make it ever did. When Defendant set the telepractice cutoff, it published that "The CFCC has determined that all Clinical Fellows who have initiated their CF experience on or before December 31, 2022, may engage in telepractice and telesupervision using the 2022 guidelines below for the entirety of their CF experience." (ECF No. 61-2, PageID.661; Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2424-2425.) A council, acting as a body, determining a rule, and publishing it prospectively.

Gallagher herself described where that authority sits, and what a fellow in Plaintiff's position was owed. In the response she drafted for Plaintiff on September 20, 2023 and circulated to her own staff for review, she wrote that if a mentor answered "no" to any question on the mentor verification form, he would "have the ability to appeal the Council for Clinical Certification (CFCC), the committee of ASHA certified volunteers who are charged with setting and maintaining the ASHA certification standards, explain the situation that occurred and request that the time be allowed to count toward your clinical fellowship," and that "[i]f they approve your request, then you will be able to count up to 100% of the hours earned through telepractice during your clinical fellowship." That response was never sent to Plaintiff, and no sent copy appears in Defendant's production. The certification analyst who nine days earlier had told him that orientation and training count toward the start date reviewed the draft and let that answer stand (Ex. 11, Bates 000913-000914; ECF No. 1-6, PageID.26). By Defendant's own account, that council — not a staff member — was to decide whether the 2022 time counted, on a request Plaintiff was entitled to make and explain. It was answered instead by a staff email — and Defendant has never identified the body that adopted the rule or where it is written. Nor is there evidence the rule was an established standard rather than a determination made in this case: asked whether it had ever recognized a fellowship as initiating with professional activities preceding first client contact, and if so to identify each such applicant and document, Defendant answered "Yes" and then identified none (ECF No. 84-1, PageID.950-951). The point precedes any comparative-treatment question: a rule that appears in no writing, that no body adopted, and that Defendant cannot show it has ever applied to anyone else is not a standard to which a court owes deference. It is a decision about one person, described afterward as a rule.

Defendant's own drafting instrument treats that email as the requirement. The Review and Motions Form prepared for the June 14, 2025 hearing states the Principle II, Rule B rationale in these words: the Respondent violated the Rule "as evidenced by the Respondent affirming they had met ASHA's certification requirements for their Clinical Fellowship after being informed by the ASHA's Director of Clinical Certification that he did not meet these requirements." (ECF No. 61-6, PageID.682.) Plaintiff does not argue that a draft and a final decision must match word for word; a board that refines a draft is deliberating. The difficulty is one of notice. The Initial Determination he received, the approved minutes of both votes, and the Decision After Further Consideration all state a different basis for the same finding — "the Respondent exceeding the 25% telepractice limit of direct client contact hours during the application process." (ECF No. 38-1, PageID.418; ECF No. 61-6, PageID.676, 672; ECF No. 38-2, PageID.421.) Plaintiff first saw that version in discovery: he defended against one theory of the Rule B violation while Defendant's own instrument recorded another, and Defendant has never said which the Board adopted. Neither version identifies a written requirement he violated: one rests on a telepractice cap that Defendant's own published guidance does not apply to a 2022 fellowship, and the other rests on an email. The Board's written "BE 25-003 Further Consideration Hearing Questions for Roderick Wright" treated those emails as the standard: "On September 13, 2023 and again on October 5, 2023, Amanda Gallagher, ASHA's Director of Clinical Certification, informed you via email that your CF experience start date was after January 1, 2023. In these emails, she explained why your CF experience began in 2023. . . . Why did you decide to reapply for ASHA certification on April 13, 2024, and claim a 2022 CF experience start date?" (ECF No. 1-15, PageID.76.) And the seven written questions contain none asking when the fellowship began, who mentored it in 2022, or what the contemporaneous records show. Question 3 asks whether

Plaintiff "disagree[s]" with statements attributed to Stevenson; the last asks whether he believes he violated the Code (ECF No. 1-15, PageID.75-77). A credentialing body's employees do not acquire the council's rulemaking power by writing a sentence in an email.

Second, the tribunal resolved the evidentiary conflict by fiat rather than by any rule, on a record it had been told was incomplete. The Board did not weigh the Schwartz confirmation, the Hanawalt confirmation, the state licensure records, or the employer records and explain why they were outweighed; per its Senior Director of Ethics, it simply deemed Gallagher's emails to have "superseded" both its own certification analyst and every source outside ASHA — including the ASHA-approved mentor its own certification system requires to verify the fellowship (ECF No. 42-8, PageID.483). What Meyer described was never put in writing to Plaintiff at all, and was never conveyed to him before the Board decided. It reached him only because counsel wrote down what she had been told on a telephone call — in a proceeding whose own rules provide that "[a]ll notices shall be in writing and are effective on the date sent." (Practices and Procedures § II.E.) When Plaintiff's counsel wrote on July 10, 2025 asking for a call "to understand more about how ASHA reached its determination and the evidence it considered," Meyer agreed to speak and added: "please be aware that I do not speak for the ASHA Board of Ethics. My comments will be about my understanding of the case." (Ex. 14, Bates 000225-000226.) Defendant has produced no writing in which the Board itself stated that rationale to Plaintiff. The record was no better: both copies of the Hanawalt email reached the Board severed at the same word (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2418, 2426). And Defendant's own Review and Motions Form, which logged Plaintiff's objection that the Board had been given only "a partial version" of the email, itself recites the complete sentence — proof that the Ethics Office knew the very words the Board's copies were missing (ECF No. 61-6, PageID.681). The

Ethics Office had an express power to cure the omission — Section II.G authorizes it to "reasonably request additional documentation from the Complainant and the Respondent" — and the record shows no such request. The office holding that curative power was the office that had assembled and presented the record containing the truncation. Defendant's Decision After Further Consideration affirmed the original findings without addressing the objection at all (ECF No. 38-2, PageID.421-422). A tribunal that shortens the record before it, and then shortens the rule it applies, has not weighed the evidence. It has selected it.

Third, the chronology the Board was given was not merely incomplete; part of it was impossible. The complaint told the Board that Plaintiff's fellowship "began on October 5, 2022 under the mentorship of Marlaina Stevenson." (ECF No. 80-1, PageID.912.) The synopsis the ethics office received placed it a month earlier still — "a start date in September 2022 with mentor Marlaina Stevenson." (ECF No. 71-4, PageID.771.) Stepping Stones did not introduce Ms. Stevenson to Plaintiff until November 8, 2022 (ECF No. 85-16, PageID.1279-1286 (unaltered message headers, authenticated at ECF No. 85)). In that same authenticated exchange, Stepping Stones' regional clinical manager wrote that Plaintiff "has already started his licensure application with Victoria Hanawalt . . . as the temporary supervisor on record," and Ms. Hanawalt wrote, "[W]e will need to process to make the transfer to the permanent supervisor happen with the NM RLD SLP Board." (Id., PageID.1281-1282.) No document in this record shows that transfer was completed. The correct sequence was in the Board's own file: Plaintiff's counsel had told it that Ms. Hanawalt was his initial mentor and signed the New Mexico plan, that Laura Syme was assigned October 13, 2022, and that Ms. Stevenson was assigned November 8, 2022 (ECF No. 61-8, PageID.689). Defendant concedes the point elsewhere, describing Ms. Stevenson as "the SLP who was supposed to be the Respondent's CF mentor." (ECF No. 61-6, PageID.679.) A

tribunal cannot make a reasoned finding about when a fellowship began from a chronology that places a mentor in charge of it a month or more before she was assigned — particularly when the accurate sequence was in its own file.

Michigan courts have found arbitrariness on precisely this ground. In *Maitland* the reviewing committees were held to have acted arbitrarily because they "failed to adequately investigate" an irregularity that could have affected the outcome, and because the analysis that might have resolved it "w[as] not available to the [committee] until it had twice ruled on plaintiff's appeals." 76 Mich. App. at 638. The finding affirmed on appeal was that "[t]here was no attempt to obtain any knowledge about it that might have been helpful, and as a consequence each decision that was made was in fact arbitrary." Id. at 637-38. A body that never sought the complete document cannot invoke the incompleteness of its own record as the boundary of review. The failure to investigate reaches back to the first assertion that the 2022 period did not count. Gallagher ruled on a supposition — "If I understand correctly, you did not ultimately work with any clients during your time with the Stepping Stones Group?" — without waiting for the answer. That supposition passed unexamined into the Review and Motions Form, the complaint, and the findings (ECF No. 38-1, PageID.416). "There was no attempt to obtain any knowledge about it that might have been helpful" is a literal description of this record.

Fourth, the investigation was bespoke and one-sided. On May 23, 2024, with the mentor's verification already in hand (ECF No. 70-5, PageID.755), Philbrick wrote: "It looks like the CF experience was confirmed by his mentor BUT we/Amanda is reaching out to them to confirm what they said yes too [sic]. If they say yes we will confer with the Executive Committee and/or SLP committee on next steps." (Id., PageID.754.) On June 17, 2024 Defendant sent the mentor out-of-process questions — date of hire, start date, telepractice percentages, method of

supervision — that appear nowhere on the verification form and that Defendant has not shown it asked any other applicant's mentor (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426). Plaintiff had raised that concern eight months earlier: "Are you planning on doing this to everyone who began their CF in August as well?" (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2425.) The internal answer the next morning was "I agree that we will stop answering him, as requested." (Pl.'s Opp'n Ex. L, ECF No. 86-13, PageID.2461.) Interrogatory No. 11 asked Defendant to "[s]tate whether ASHA has, at any time between January 1, 2020 and December 31, 2024, recognized the 'initiation' of a Clinical Fellowship for any other applicant based on professional activities (such as orientation, training, or file review) that occurred before that applicant's first direct client contact hour" — and, if so, to identify each such applicant and the documents reflecting that initiation date. Defendant answered "Yes," recited Standard VII-A's segment requirements, and identified no applicant and no document (ECF No. 84-1, PageID.950-951). It has sworn the practice exists and, though asked directly, has declined to produce a single instance of it.

Its Senior Director of Ethics flagged the problem before the complaint was filed. On August 6, 2024 Meyer wrote: "If you have had other similar cases like this in the past, I think it is important to follow your past precedent. Treating Mr. Wright differently than other prior applicants could lead to claims of bias and possibly discrimination. I am hoping that your past precedent in cases like these includes revoking his certification." (ECF No. 71-4, PageID.770.) Her own framing left open whether any precedent existed, and no comparable case appears anywhere in this record. Nor did Defendant request the documentation its own Chief Certification Officer predicted Plaintiff could produce (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000425). On July 1, 2024, a week after certification, Philbrick asked whether to "follow-up" with

the mentor's employer or "just send this to the SLP committee in 12 days as is." Schwartz answered that the mentor's account was "corroborated by what Roderick already put in writing to us previously," and then reached for what was left: the mentor "never did provide his hire date with their organization. Maybe that is what we need to verify." (Ex. 7, Bates 000379.) A hire date is not a certification criterion. Defendant's own Guide notes that a fellow's employment role varies by site — "In some instances, Clinical Fellows are considered interns, and in others they are full staff members" (Ex. 4, at 4) — and its verification form does not ask for a hire date at all. The certification standards run the same way: Standard VII-A defines the fellowship as "clinical service activities" measured in weeks and hours, and nowhere conditions it on employment status or compensation (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2409).

Fifth, the decision was pre-written by interested officials. On May 13, 2025, a month before the Initial Consideration Hearing, Board reviewer Danielle Osmelak told Meyer, "I wrote up BE 25-003 (& it's on the drive) & it's a beast," noting she had already "left a note in the document about the duration of the revocation" and had already selected which Code principles to charge; Meyer replied, "It WAS a BEAST. THANK YOU for taking it on. . . . You rock!!!" (Pl.'s Opp'n Ex. I, ECF No. 86-10, Bates 000249.) Meyer had designed the sanction two days earlier, on May 11, 2025 (ECF No. 71-3, PageID.769). The Board imposed it — a six-month revocation with reinstatement by petition — thirty-four days later. Metadata shows the "Wright Timeline" given to the Board originated with Meyer (Pl.'s Opp'n Ex. J, ECF No. 86-11, PageID.2459). And the panel's "Review and Motions Form" arrived at the hearing with the findings of violation and the sanction already written into it and its workflow already signed off — "Reviewed by Chair," "Reviewed by Sr. Dir." — before any vote (ECF No. 61-6, PageID.678–683). Defendant filed the form's version history as an exhibit to its own discovery-motion response: seventeen versions,

edited by five different individuals, every one of them before the vote (ECF No. 76-2, PageID.836-839). Version 1.0 was created by Meyer on May 11, 2025 — the same day she wrote that there was no option other than revocation. (Id.) Fifteen versions were complete by May 30, 2025, the last saved by Meyer; only two followed — version 16.0 on June 8, and version 17.0 at 9:20 a.m. on June 14, seventy minutes after Panel 2 convened (ECF No. 76-2, PageID.839; ECF No. 75-2, PageID.821; Ex. 13, Bates 000318).

The same instrument governed further consideration. Defendant filed the "FCH Review and Motions Form" as its own exhibit here, and it carries the Initial Determination's three findings and six-month revocation forward under the heading "ICH DECISION WITH PROPOSED ICH SANCTION." (ECF No. 38-1, PageID.418.) Page 6, headed "EVIDENCE FOR FCH — Cite Relevant Evidence for FCH," is blank in all three copies Defendant produced, and no completed version appears anywhere in the 1,033 pages of Defendant's three productions (Ex. 9, Bates 000059, 000638, 000651). Thirteen members affirmed on October 25 on a form whose evidence page no produced copy ever filled in.

The officials who wrote the Review and Motions Form sat on the panel that adopted it. Defendant's own form names Osmelak as "Reviewer" at both stages, and its "Recused" line is blank at both (ECF No. 61-6, PageID.678; ECF No. 38-1, PageID.415). The unredacted minutes list her among the seven members present on June 14, 2025, seated as Vice Chair, and among the thirteen present on October 25, 2025 — headcounts matching the 7–0 and 13–0 tallies (Ex. 13, Bates 000315, 000318; ECF No. 61-6, PageID.672-673, 675-677). Nor was Osmelak the only author seated. Versions 6.0 through 10.0 — five saves on the evening of May 27, 2025, each file larger than the one before — were made by "michele simler" (ECF No. 76-2, PageID.837-838), whom the minutes seat as the Board's Chair at both hearings: "Shelly Simler, (BOE Chair)" on

June 14, 2025, and "Michele Simler (Chair)" of both panels on October 25, 2025 (Ex. 13, Bates 000318, 000315). The form reached the June hearing with its "Reviewed by Chair" box already checked. Defendant's Practices and Procedures contain no express recusal rule, but a body that prints a "Recused" line expects the question answered; at both hearings it sat blank while the form's authors sat on the panel. Defendant's lead authority names the defect: in *Cooley* the law school raised "the combined prosecutorial and adjudicative functions" of the sanctioning body, and the Sixth Circuit treated it as error requiring a showing of prejudice, 459 F.3d at 716. That showing is made in the prejudice discussion below. A unanimous tally by a body that includes the document's authors measures agreement with the document, not independent review of it. Drafting is not prejudgment. Drafting by an official who has announced the outcome in advance, on a record that official assembled, followed by a vote that changed nothing, is.

These defects are not waived. The waiver rule comes from the *Foundation* decision itself, which conditions judicial consideration of a bias allegation on the party having raised it before the association's appeals panel. 39 F. Supp. 2d at 897-98. Plaintiff does not ask this Court to entertain a freestanding bias claim raised for the first time here. Count III is what it has always been: a claim that Defendant failed to apply its own written procedures, failed to address evidence it was told was missing, and decided on a record its own officials had assembled and pre-resolved. To the extent the rule reaches further, it cannot bar an objection Plaintiff had no way to discover. Meyer's May 11, 2025 message, the internal drafting messages, the version history of the Review and Motions Form, and the pre-drafted findings were in Defendant's exclusive possession and were produced for the first time in March and April 2026, months after Plaintiff's Further Consideration submission and after the Board had voted twice. Nor did Plaintiff sit silent. On August 20, 2025 he served Defendant with a written preservation notice

objecting on “due process grounds,” stating that Defendant had refused “to dismiss the complaint despite clear exculpatory evidence,” and demanding preservation of all “drafts, notes … shared-drive files, and metadata.” (ECF No. 70-2, PageID.737-738.) He told the Board, on the record, that it had been given a partial version of the dispositive document (ECF No. 61-6, PageID.681). And on December 2, 2025 he put the substance of this claim to Defendant’s Ethics Appeal Panel in the words Defendant’s own rule requires, contending that the decision “fails to follow ASHA’s own standards and obligations” and is “arbitrary and capricious and not supported by the record.” (Ex. 12, Bates 000065-000066.) Plaintiff does not contend that appeal itemized every ground he now advances; the drafting record had not been produced. *Foundation* conditions review on the party having raised the objection, not on his having anticipated the documents the association was still withholding.

The complaint itself was an in-house production wearing the name of a member who did not write it, and Defendant’s own summary judgment exhibit shows it. In the field labeled “COMPLAINANT: (Individual filing the complaint),” the entry is not an individual but “ASHA Council for Clinical Certification in Audiology and Speech-Language Pathology,” at Defendant’s headquarters, email CFCC@asha.org (ECF No. 80-1, PageID.910-911). Gallagher described the plan as “bringing the case to the CFCC to see if there is a member who would like to make a formal ethics complaint.” (Pl.’s Opp’n Ex. D, ECF No. 86-5, Bates 000424.) The object was to find a member willing to sign, not to ask the Council whether a complaint was warranted. Gallagher drafted the “BOE report for Roderick,” asked Laura Verdun, a Council member, to “let me know if you approve” (ECF No. 71-1, PageID.766), and submitted it herself, “On behalf of the Council for Clinical Certification (CFCC).” (ECF No. 71-1, PageID.767.) She had used the same method weeks earlier on the companion complaint against Plaintiff’s mentor, telling

Verdun, “Once this has been submitted, I will put together the complaint against Mr. Wright”; Verdun returned it with “[o]nly one edit included” (Pl.’s Opp’n Ex. D, ECF No. 86-5, PageID.2436). Defendant’s 2020 Standards charge the CFCC “to have final authority to withdraw certification in cases where certification has been granted on the basis of inaccurate information.” (Pl.’s Opp’n Ex. B, ECF No. 86-3, PageID.2397.) The complaint alleges exactly that. But the certification it attacked had been granted on accurate, mentor-verified information after Defendant’s own review (ECF No. 29-16, PageID.351; ECF No. 77, PageID.865), and the Council never tested the allegation: Defendant produced no Council or SLP Committee minutes, attendance record, or vote. Plaintiff does not contend revocation was a jurisdictional prerequisite. The point is narrower: the body charged with that authority never found any inaccuracy. Defendant’s interrogatory answer states that Committee minutes “were provided with the previous Request for Production” (ECF No. 84-1, PageID.950); no such minutes appear anywhere in the 1,033 pages produced. Defendant used the Council’s name on a staff-written complaint instead, bypassing the route under which the CFCC could allow the time to count in full (Ex. 11, Bates 000913-000914). Gallagher thought it might succeed: “The CFCC may very well approve it once appealed.” (Ex. 2, Bates 000369.) Plaintiff was never told what that route could yield. And Meyer’s August 6, 2024 assessment conceded that no identified rule barred the charged conduct: “ASHA does not explain to Ms. Johannes that she cannot submit a supervisor verification form for time she did not supervise. (Maybe that is stated in the CF mentorship documentation.)” (ECF No. 71-4, PageID.770.) The Ethics Office could only speculate — “[m]aybe” — that such a rule existed; it charged and sanctioned two people anyway. And the charge misdescribes the form: what Johannes verified were the fellowship’s dates, weeks, and

hours (ECF No. 29-16, PageID.351); Defendant has identified no field asking a mentor to certify that she personally supervised every day of that span, and no rule requiring it.

Sixth, Defendant's treatment of the witnesses tracks the record's inconvenience rather than any rule. Defendant censured Plaintiff's mentor for verifying the very 2022 start date its own contemporaneous records support, and its Chief Certification Officer had answered that same verification with "Thank you for this confirmation." (ECF No. 45-2, PageID.507-509; Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2394.) The supervisor of record — who signed the state fellowship plan and put the 2022 start in writing — was never charged at all; her confirmation reached the Board cropped at the operative words, as set out above.

Taken together, these are not competing readings of ambiguous rules but departures from written provisions Defendant drafted, published, and invoked against Plaintiff, each bearing on the premise the Board acted upon. Nothing in this claim depends on the expired six-month term. Plaintiff does not ask the Court to undo a sanction that has run; he asks it to set aside findings that remain published, remain reported to a state licensing authority, and continue to operate on his ability to practice. Defendant's own verification portal reported Plaintiff as "Not Certified" the day after the stated term expired and still displayed the ethics notice (Ex. 3), and reinstatement is not automatic but requires a petition to the Board of Ethics, Board action, and then a new application for certification (Ex. 5, at 15). Under Michigan law the question is whether the association followed its own rules, not whether the penalty has lapsed.

Finally, Defendant's "fraud" theory rests on conflating an application with the fellowship itself. The complaint told the Board that Plaintiff had been advised that the fellowship beginning October 5, 2022 under Stevenson "did not meet certification standards," that he "subsequently withdrew the application," and that his later use of an October 2022 start date is therefore

"evidence that he knowingly submitted false/incorrect data to gain ASHA certification." (ECF No. 80-1, PageID.912-913.) Defendant's own system record of that 2022 application does not say what the complaint says. It shows three Clinical Fellowship report entries under mentor "Stevenson Marlaina R," each carrying a ReportedBegin of 10/5/2022, and three stated reasons for their disposition: "Not enough supervisory activities," "Canceled by applicant in COLA," and "Report entered incorrectly." (Pl.'s Opp'n Ex. B, ECF No. 86-3, PageID.2413.) Not one is that the fellowship had not begun. Plaintiff does not defend that report: he entered it expecting Ms. Stevenson to supervise, cancelled it himself when the assignment ended before she supervised anything, and began again — which is what the second and third dispositions record. The first is the supervision shortfall addressed above, a crediting condition. Self-correction is not concealment, and a statement matching Defendant's own published definitions cannot be a knowing misrepresentation. As Section B sets out, Defendant's own system validated the mentor, the site, and the segment alike — not merely the hours. Under Defendant's own Guide, that is the end of the matter: an applicant who called that period his Clinical Fellowship described it exactly as Defendant's published framework does — a completed partial segment of the CF whose hours are not counted (Ex. 4, at 6). And the operative application is itself in the record, in full (Pl.'s Opp'n Ex. H, ECF No. 86-9, PageID.2446-2457): the only entry Defendant has ever identified as false is the start date itself — the entry every contemporaneous document in this record corroborates. Closing a certification application ends a paperwork process; it does not end a fellowship being performed under a state license, with a mentor of record, logged in Defendant's own portal — and Defendant certified that fellowship six months later. Defendant has produced no September or December 2023 document describing a cancelled fellowship; that characterization first appears in materials prepared for the ethics proceeding — beginning with

the case timeline Meyer herself authored, as its native metadata records (Pl.'s Opp'n Ex. J, ECF No. 86-11, PageID.2459). When Plaintiff filed his operative April 2024 application he listed Rachel Johannes, the mentor who actually supervised and verified his hours; Defendant's own synopsis confirms Stevenson "was unable to verify the experience because there was no direct mentorship provided during the brief period of employment." (ECF No. 71-4, PageID.771.) No written standard requires an applicant to list temporary, unutilized mentors from a closed application. Using a paid but never-completed application, which Plaintiff had asked Defendant to close, to brand the operative application dishonest — while Defendant's own staff admitted that without the first application they "would have never had suspicions" (Pl.'s Opp'n Ex. E, ECF No. 86-6, Bates 000426) — is not the application of a standard. On this record, no reasonable factfinder could conclude that Defendant's procedure was fair.

Prejudice is the showing Defendant's own lead authority requires, and the first three defects supply it directly. *Cooley* holds that procedural complaints fail unless they "hint at the existence of prejudicial error," because "[a] mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." 459 F.3d at 716 (quoting *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 468 (6th Cir. 2004)). The test *Cooley* then applied is whether the complaining party can show "that it would not have been sanctioned had these alleged errors not occurred." 459 F.3d at 716. *Cooley* could not, because its noncompliance was undisputed and its alleged errors — no cross-examination, combined prosecutorial and adjudicative functions, a possible ex parte submission — left the operative facts untouched. That is the opposite of this case. The defects here are not adjacent to the operative fact; they are the operative fact. Every violation the Board found depends on the fellowship having begun in 2023. Remove the after-the-fact initiation rule and the finding has no

premise. Give the Board the complete Hanawalt confirmation it was told it was missing and the premise is contradicted in writing by Plaintiff's supervisor of record. Give it the accurate mentor chronology and the complaint's central factual assertion collapses. Plaintiff does not argue that a fairer procedure might have produced a better-reasoned result; he argues that on the record Defendant itself assembled, the violations could not have been found at all. The remaining defects are not offered as independent grounds for judgment. They explain how a record with those three flaws in it reached a vote unexamined. Michigan states the same requirement in its own terms: a member "is entitled to claim that nothing important shall be disregarded to his prejudice." *People ex rel. Roehler v. Mechanics' Aid Society*, 22 Mich. 86, 91 (1870).

**V. Conclusion**

For these reasons, Plaintiff respectfully requests that the Court grant summary judgment in his favor on liability on Count III; declare that the Board of Ethics' decision in BE 25-003 is invalid and set it aside, and that the revocation is of no legal effect and Plaintiff's Certificate of Clinical Competence is to be treated as having been continuously held from June 25, 2024; deny Defendant's Motion for Summary Judgment; grant such further relief as the Court finds appropriate; and, in the alternative, remand the matter to Defendant as described in the motion.

Respectfully submitted,

Dated: August 12, 2026

/s/ Roderick Wright

Roderick Wright

6181 Lake Michigan Drive, #103

Allendale, MI 49401

(616) 990-9284

wrightiir@yahoo.com

Plaintiff, pro se

**CERTIFICATE OF COMPLIANCE**

Pursuant to LCivR 7.2(b)(ii), I certify that this brief complies with the word-count limitation set forth in LCivR 7.2(b)(i). This brief contains 10,796 words, excluding the case caption, the signature block, attachments, and exhibits. The word count was generated by Microsoft Word for Microsoft 365.

Dated: August 12, 2026

/s/ Roderick Wright

Roderick Wright

6181 Lake Michigan Drive, #103

Allendale, MI 49401

(616) 990-9284

wrightiir@yahoo.com

Plaintiff, pro se